## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| **YOCHEVED JUNGER and JACQUELINE KATZ,** | |
| *Plaintiffs*, | |
| **v.** | Civil Action No. 4:25-cv-650 |
| **DSQUARED RELATIONSHIPS PLLC,** *d.b.a. D2 Counseling*, **DINA HIJAZI, and DANIEL GOWAN,** | |
| | **JURY DEMAND** |
| *Defendants*. | |

### FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs Yocheved Junger ("Junger") and Jacqueline Katz ("Katz") file this Original Complaint and Jury Demand against Defendants DSquared Relationships PLLC, doing business as D2 Counseling ("D2"), Dr. Dina Hijazi ("Hijazi"), and Reverend Daniel Gowan ("Gowan") (collectively, "the D2 Defendants"), and allege as follows:

### I.    PRELIMINARY STATEMENT

1.    This case seeks to hold D2, a mental health counseling clinic based in Dallas, Texas, and its owners Hijazi and Gowan, accountable for their overt acts of retaliation and discrimination against Junger and Katz, two Jewish therapists who were both abruptly and unlawfully terminated by the D2 Defendants in November 2024, in blatant violation of Section 1981 of the Civil Rights Act of 1866 ("Section 1981").

2.    This case underscores an important principle set out in binding Supreme Court precedent: for purposes of civil rights statutes, Jews are treated as a "distinct race[]" and no employer—even one who classifies its workers as independent contractors and who may not

**Plaintiffs' First Amended Complaint - Page 1**

otherwise be subject to state or federal laws prohibiting discrimination based on religion due to its size—may discriminate or retaliate against its Jewish employees with impunity.[1]

3.     As set forth in more detail below, this action involves the retaliatory termination of two Jewish therapists by D2 and its co-owners, Dr. Dina Hijazi and Reverend Daniel Gowan. D2 advertises itself on its website as offering "a holistic and practical approach to relationship therapy" with a "balanced style stemming from [D2 counselors'] diverse training and backgrounds." On November 19, 2024, during a team meeting, a non-Jewish colleague at D2 solicited advice from Junger and Katz concerning how to treat a Jewish patient struggling with how to process incidents of antisemitism occurring with rising frequency worldwide. Rather than allowing Junger and Katz to offer insights or direct their colleague to helpful resources, co-owner Hijazi intervened and shut down any further conversation, stating, "I don't think that's a good idea because you'll get a one-sided response." The following day, Hijazi circulated a team email to further enforce her directive that no conversations take place on how to support Jewish clients struggling with antisemitism, explaining that "the Palestine Israel topic" caused her "great pain"—even though this topic was not explicitly raised or even alluded to during the previous day's team meeting. After Junger and Katz respectfully advocated for the importance of D2 offering "culturally competent" counseling to *all* clients, both Jews and non-Jews alike, Junger and Katz were told that they were "way over the line." Then, less than 24 hours after sending heartfelt emails to the D2 Defendants outlining their opposition—in writing—to Hijazi's discriminatory treatment of them and of the clinic's Jewish client, the D2 Defendants terminated both Junger and Katz. The only reason the D2 Defendants provided for their terminations was that they were no longer a "good fit" for the clinic.

---

[1] *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) ("Jews and Arabs were among the peoples then considered [when these civil rights statutes were passed] to be distinct races and hence within the protection of the [civil rights] statute[s].").

**Plaintiffs' First Amended Complaint - Page 2**

In other words, Hijazi and Gowan concluded that D2 was not a "good fit" for Jewish employees, particularly Jewish employees who advocate against unlawful discrimination of themselves and their Jewish clients. Junger and Katz now bring this action against the D2 Defendants for unlawfully discriminating against them because of their Jewish identities, and for retaliating against them for exercising their right to oppose unlawful workplace discrimination.

## II.    JURISDICTION AND VENUE

4.    The Court has federal question subject matter jurisdiction over Junger and Katz's interference with their right to contract based on race arising under Section 1981 pursuant to 28 U.S.C. § 1331. The Court also has federal question subject matter jurisdiction over Junger and Katz's retaliation claim arising under Section 1981 pursuant to 28 U.S.C. § 1331.

5.    The Court has personal jurisdiction over the D2 Defendants because Hijazi and Gowan are Texas residents and D2 has continuous and systemic business contacts with the State of Texas. D2 is based and operates exclusively in Dallas, Texas.

6.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because it is the judicial district in which the majority of the defendants reside and because all the defendants reside in the State of Texas.

## III.    PARTIES

7.    Plaintiff Yocheved Junger is a Texas resident, and she is credentialed by the State of Texas as a Licensed Master Social Worker. Junger lives in Dallas County, Texas.

8.    Junger is expected to obtain additional credentials as a Licensed Clinical Social Worker within the next few months. In March 2022, Junger entered into a contract with D2 to provide "Counseling, Workshops, and Group Therapy" for D2's's clients. Although D2 initially classified Junger as an independent contractor, she was reclassified as a W-2 employee by D2 in

March 2023. Junger continued to work for D2 as an employee up through her unlawful termination on or about November 25, 2024.

9.      Plaintiff Jacqueline Katz is a Texas resident, and she is credentialed by the State of Texas as both a Licensed Professional Counselor and a Licensed Chemical Dependency Counselor. Katz also lives in Dallas County, Texas.

10.      In July 2018, Katz entered into a contract with D2 to provide "Counseling, Workshops, and Group Therapy" for D2's clients. D2 classified Katz as an independent contractor, and she continued to work for D2 in that capacity up through her unlawful termination on or about November 25, 2024.

11.      Defendant Dr. Dina Hijazi is a co-owner of D2 and a Texas resident. On information and belief, Hijazi resides in Collin County, Texas. She is a licensed psychologist who obtained her Ph.D. in psychology from the University of Texas, Austin. In her profile on D2's website, Hijazi claims to have "committed [her] professional career to serving the psychological, social and emotional needs of [her clients]." Hijazi was a key decision-maker with respect to the unlawful termination of Junger and Katz's contracts with D2.

12.      Defendant Reverend Daniel Gowan is a co-owner of D2 and a Texas resident. On information and belief, Gowan resides in Collin County, Texas. He is credentialed by the State of Texas as a Licensed Chemical Dependency Counselor and a Licensed Professional Counselor Supervisor. In his profile on D2's website, Gowan claims that he uses his background in ministry to "integrate spiritual principles into helping clients gain a deeper understanding of themselves, their partner, and other important people in their lives." Gowan was a key decision-maker with respect to the unlawful termination of Junger and Katz's contracts with D2.

**Plaintiffs' First Amended Complaint – Page 4**

13.     Defendant DSquared Relationships PLLC, doing business as D2 Counseling, is a therapy practice organized under the laws of the State of Texas. Its principal place of business is located at 17210 Campbell Rd., Suite 175, Dallas, TX 75252.

## IV.    FACTUAL BACKGROUND

### A. Recognition and Understanding of Antisemitism in the Mental Health Field.

14.     The American Psychological Association (the "APA") is the leading scientific and professional organization representing psychology in the United States. The APA's stated mission is to "promote the advancement, communication, and application of psychological science and knowledge to benefit society and improve lives."[2] One of the ways in which the APA endeavors to achieve this goal is by adopting resolutions that help to guide policy and practice in the field.

15.     In 2005, as a response to the continuing prevalence of antisemitism, the APA adopted the "Resolution on Anti-Semitic and Anti-Jewish Prejudice" (the "Resolution"), in which it condemned "all anti-Semitic attitudes and actions, both overt and covert" and promoted "fairness, respect, and dignity for all people, regardless of religion or ethnicity, in all arenas in which psychologists work and practice."[3] Importantly, the Resolution also recognized, among other things, that:

   a. Antisemitism or "anti-Jewish hostility" has taken "various forms over the centuries," and that much of the antisemitism we see today takes the form of "prejudiced attitudes" and "discriminatory statements or acts" perpetrated by those who deny "actual bias against Jews";

   b. Perpetrators of modern antisemitism may find it difficult to identify their anti-Jewish bias, "as their beliefs about themselves may be that they are not biased against Jews";

---

[2] See "About APA," APA.org, last updated January 2025, accessed March 25, 2025, https://www.apa.org/about.
[3] See "Resolution on Anti-Semitic and Anti-Jewish Prejudice," APA Counsel of Representatives, August 2005, amended August 2007, https://www.apa.org/about/policy/antisemitic.pdf.

**Plaintiffs' First Amended Complaint - Page 5**

c.  The antisemitic nature of modern anti-Jewish hostility may be disguised as "discourse regarding the actions of the Government of Israel"; and,

d.  "[E]xtreme anti-Israel rhetoric" can lead to "demonization and dehumanization of Jews."[4]

16.  In a research article published by the APA in 2024, a group of Jewish psychologists described the various forms of antisemitism that may exist in psychological settings by categorizing antisemitism into four central themes: (1) overtly antisemitic behavior, (2) tropes/stereotypes, (3) erasure/invisibility of identity, and (4) silencing.[5]

17.  Of particular importance here, the article defines "silencing" as a type of antisemitism that "creates environments where some Jewish people feel excluded and even unsafe to reveal important parts of their identity and assimilate in efforts to avoid negative social, educational, or professional consequences."[6]

18.  Some examples of silencing as a form of antisemitism provided in the article include "[d]enying Jewish trauma, suppressing Jewish voices, and refuting the lived experiences of Jewish individuals."[7]

**B. Defendants, as Licensed Psychologists, Must Comply with Ethical Standards for Mental Health Professionals Relating to Eliminating Bias in Therapy.**

19.  In the process of making decisions regarding their professional behavior, licensed psychologists—such as Hijazi—are required to act in accordance with the rules and guidelines set

---

[4] *Id.*

[5] Elizabeth Getzoff Testa, Jamie A. Becker, Micah S. Brosbe, Aria E. Fiat, Caroline C. Kaufman, Carly Berger, Danielle Fishbein & Yael Gross, "Widening the Tent: Jewish Inclusivity, Antisemitism, and Recommendations for Action in Pediatric Psychology," *Clinical Practice in Pediatric Psychology*, Vol. 12, No. 4, 442 (Dec. 2024), https://doi.org/10.1037/cpp0000542.

[6] *Id.* at 445.

[7] *Id.* at 446.

**Plaintiffs' First Amended Complaint - Page 6**

forth by the APA's Ethical Principles of Psychologists and Code of Conduct (the "APA Ethics Code").[8] Some relevant sections of the APA Ethics Code include the following:

    a.   Section 3.01, Unfair Discrimination, which prohibits unfair discrimination based on religion, ethnicity, national identity, and other protected characteristics;

    b.   Principle E: Respect for People's Rights and Dignity, which demands respect for people's rights and dignity and requires psychologists to try to eliminate the effects of biases in their work;

    c.   Section 2.01, Boundaries of Competence, which requires psychologists to obtain "the training, experience, consultation, or supervision necessary to ensure the competence of their services" where "scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with . . . race, ethnicity, culture, national origin, [or] religion . . . is essential for effective implementation of their services or research";

    d.   Section 3.03, Other Harassment, which prohibits psychologists from knowingly engaging in "behavior that is harassing or demeaning to persons with whom they interact in their work based on factors such as those persons' . . . race, ethnicity, culture, national origin, [or] religion";

    e.   Section 3.04, Avoiding Harm, which requires psychologists to "take reasonable steps to avoid harming their clients/patients, [] supervisees, . . . and others with whom they work, and to minimize harm where it is foreseeable and unavoidable"; and,

    f.   Section 3.09, Cooperation with Other Professionals, which requires that psychologists "cooperate with other professionals in order to serve their clients/patients effectively and appropriately."[9]

    20.    Additionally, the APA considers "cultural competence" to be "such an integral part of the field that it's listed as one of psychology's core competencies."[10] The APA loosely defines

---

[8] *See* American Psychological Association, "Ethical Principles of Psychologists and Code of Conduct," APA.org (issued 2002, amended June 2010 and January 2017), https://www.apa.org/ethics/code.

[9] *Id.*

[10] *See* Tori DeAngelis, "In Search of Cultural Competence," *Monitor on Psychology*, Vol. 46, No. 3 (Mar. 2015), https://www.apa.org/monitor/2015/03/cultural-competence.

**Plaintiffs' First Amended Complaint - Page 7**

"cultural competence" as the ability to understand, appreciate, and interact with people from cultures or belief systems different from one's own.[11]

21.     As the APA has made clear, obtaining an understanding of the lived experience of individuals seeking psychological treatment is a key component to culturally competent care.[12]

**C. The Rise in Antisemitism after October 7, 2023, and Its Impact on the Mental Health Field and the Jewish Community.**

22.     On October 7, 2023, Palestinian terrorists perpetrated a historically gruesome attack against Israel and the Jewish people. They murdered, tortured, and mutilated hundreds of innocent men, women, children, and babies; they brutally raped and sexually assaulted women; and they kidnapped hundreds of innocent civilians, including dozens of young children and even a nine-month-old baby. More than 1,200 people in Israel were murdered, and more than 200 were abducted into Gaza. October 7, 2023, was the deadliest day in Jewish history since the Holocaust.

23.     Since the events of October 7th, there has been a dramatic 340% increase in global antisemitism.[13] This rise in antisemitism has had a profound impact on the mental health of

---

[11] *Id.*

[12] *See* American Psychological Association, "Guidelines for Providers of Psychological Services to Ethics, Linguistic, and Culturally Diverse Populations," APA.org (issued 1990), https://www.apa.org/pi/oema/resources/policy/provider-guidelines (suggesting that "[e]ffective psychological intervention may be aided by consultation with and/or inclusion of religious/spiritual leaders/practitioners relevant to the client's cultural and belief system."); *see also* Jesse Owen, Cirleen DeBlaere, Joshua N. Hook, et al., *Cultural Humility: Engaging Diverse Identities in Therapy* 9 (2017) (explaining that therapists must have cultural humility to effectively treat patients, which "involves an awareness of one's limitations to understanding a client's cultural background and experience…. [and] also involves an interpersonal stance that is other oriented rather than self-focused in regard to the cultural background and experience of the client").

[13] *See* World Zionist Organization, Department for Combating Antisemitism and Community Resilience, and The Jewish Agency for Israel, "Antisemitism General Review and Summary Report for 2024," wzo.org (accessed March 25, 2025), https://www.wzo.org.il/department/ combatting-antisemitism/antisemitism_2024/en.

**Plaintiffs' First Amended Complaint - Page 8**

members of the Jewish community throughout the world.[14]

24.     Indeed, the effects of this rise in antisemitism have been acutely felt in Texas. According to the Texas Holocaust, Genocide, and Antisemitism Advisory Commission, "In the aftermath of [the October 7th] attacks, antisemitic expressions—tied closely to hate and misinformation around Israel—surged, targeting Jewish children, families, business owners, public officials, and communities. Throughout our own state, public schools, synagogues, and Jewish community centers have been on high alert."[15] For example, Dallas City Council Member Cara Mendelsohn's home was defaced with hateful language, blood-red spray paint, and a pile of rocks, bricks, and dolls depicting dead babies.[16] Similarly, hundreds of antisemitic flyers, some of them bearing swastikas, have been found in neighborhoods near Dallas, Fort Worth, and Austin.[17] The full report by the Texas Holocaust, Genocide, and Antisemitism Advisory Commission contains many more examples of recent antisemitic incidents.[18]

25.     Equally concerning, since October 7, 2023, there have been increasing reports of antisemitism within the mental health field specifically.[19] Not only has this rise in antisemitism

---

[14] Research has found that Jews may experience traumatic events, even those they do not directly witness, as collective trauma given the historical trauma experienced by Jews. *See* Leslie Morrison Gutman & Samuel D. Landau, *Collective Trauma and Resilience for the Jewish People in the Aftermath 7th October*, 59–67 (2024); Nathan P.F. Kellermann, *Transmission of Holocaust Trauma—An Integrated View*, 256–67 (2001); Maor Shani, Jana Gerber & Marie Herb, *October 7, One Year Later: Resilience and Coping Among Jews in Germany Amid Rising Antisemitism and Collective Trauma*, 10–11 (2024).

[15] Texas Holocaust, Genocide, and Antisemitism Advisory Commission, "Study on Antisemitism in Texas," THGAAC.gov, Nov. 18, 2024, at 3, https://thgaac.texas.gov/assets/uploads/docs/2024-Antisemitism-Report.pdf.

[16] *Id.* at 15.

[17] *Id.* at 16.

[18] *Id.* at 1–17.

[19] *See, e.g.*, J. Ancis, "Open Letter to the American Psychological Association Demanding Accountability," The Times of Israel, blogs.timesofisrael.com (February 25, 2025), https://blogs.timesofisrael.com/open-letter-to-the-american-psychological-association-demanding-accountability/.

**Plaintiffs' First Amended Complaint - Page 9**

negatively impacted the quality and accessibility of care available for Jewish individuals seeking psychological help, but it has also negatively impacted the livelihoods and employment prospects of Jewish therapists and mental health professionals such as Junger and Katz.

26.    According to the Jewish Community Mental Health Initiative—a direct action fund of the American Psychological Foundation that was founded in the aftermath of the October 7th attacks to meet the urgent mental health needs of the Jewish community—many members of the Jewish community have been exposed to unprecedented levels of antisemitism in the last two years.[20] These experiences manifest in a range of painful psychological symptoms, which are common responses to ongoing stress, trauma, and collective grief.[21]

27.    In May 2025, a peer reviewed article published in the Journal of Human Behavior in the Social Environment examined the phenomenon of traumatic invalidation experienced by Jewish individuals in the aftermath of the October 7, 2023 attacks.[22] The authors describe traumatic invalidation as the experience of having one's fear, grief, identity-based harm, or trauma dismissed, minimized, reframed as illegitimate, or treated as inappropriate or destabilizing, particularly when such responses come from institutions, authority figures, or professional environments upon which individuals rely. *Id.* at 2-4. The article explains that this form of invalidation is associated with increased psychological distress, feelings of isolation and vulnerability, emotional dysregulation, and fear of exclusion, especially for minority communities experiencing heightened discrimination. *Id.* at 3-5.

---

[20] *See* "About Us," Jewish Community Mental Health Initiative, jcmhi.com (accessed March 25, 2025), https://jcmhi.com/page/about-us.

[21] *See* T. Gordon, "October 7th – The Jewish Collective Trauma Response," The Blue Dove Foundation, thebluedovefoundation.org (accessed March 25, 2025), https://thebluedovefoundation.org/october-7th-the-jewish-collective-trauma-response/.

[22] Miri Bar-Halpern & Jaclyn Wolfman, "Traumatic Invalidation in the Jewish Community After October 7," J. Human Behav. Soc. Env't (May 13, 2025), https://doi.org/10.1080/10911359.2025.2503441.

**Plaintiffs' First Amended Complaint - Page 10**

28.     The article further explains that, in institutional and professional settings following October 7, Jewish individuals frequently experienced invalidation through practices such as the suppression or discouragement of discussion about antisemitism, the reframing of Jewish expressions of fear or concern as bias or overreaction, and the placement of limits on how or when Jewish individuals could speak about antisemitism in order to minimize discomfort to others. *Id.* at 4-6. According to the authors, these responses communicate that Jewish experiences of antisemitism are unwelcome or inappropriate in professional environments and that Jewish identity itself may be viewed as a source of conflict rather than legitimate vulnerability. *Id.* at 5-7. The article emphasizes that such invalidation is particularly harmful in helping professions and clinical settings, where acknowledgement of identity-related trauma is critical to both ethical practice and psychological safety. *Id.*

29.     Although every Jewish client is different and should be seen as an individual with their own story, Jews as an ethnic and religious group share a unique lived experience when it comes to discrimination and antisemitism. Jewish clients, like all individuals seeking psychological treatment, need to be afforded an opportunity to see therapists who can provide them with culturally competent care—a point which has become increasingly more important in the wake of the October 7th attacks.

**D. Defendants Have Routinely Engaged In and Encouraged Discussions about Other Politically Charged Issues and Issues Affecting Other Races and Religions.**

30.     D2 boasts on the "About Us" section of its website that it provides its clients with a "safe, non-judgmental place" to work through their trauma. D2 explains that its counselors "take a holistic and practical approach . . . based in scientific and spiritual principles." D2 brings "both a male and female perspective to our sessions" and tells clients they can expect a "balanced style stemming from our diverse training and backgrounds."

**Plaintiffs' First Amended Complaint - Page 11**

31.    At all relevant times, D2 held mandatory Tuesday meetings for all its therapists—including Junger, Katz, Hijazi, and Gowan. Consistent with APA guidelines for peer consultation and supervision, these meetings allowed the team time to collaborate and discuss current issues and struggles faced by their clients, and to share advice, assistance, and insight among the group to help each other better serve the needs of their respective clients.

32.    During these Tuesday meetings, D2 therapists routinely engaged in discussions during which some therapists in the group shared insights with the others to provide them with a greater understanding of the unique traumas or experiences of clients of differing backgrounds with which they were familiar. During these meetings, D2 therapists also regularly discussed current events that might impact the emotional well-being of their clients, including events relating to politics and other sensitive topics.

33.    For example, during a Tuesday meeting in or about 2018 or 2019, D2 therapists discussed the special needs and issues particular to treating clients of the Mormon faith.

34.    Similarly, during a Tuesday meeting in or about 2019, D2 therapists discussed both the individual and family treatment needs for a Muslim family. During this meeting, the team also discussed Muslim and Islamic traditions and family structures in detail.

35.    During a Tuesday meeting in or about 2019 or 2020, Katz sought insight from Gowan to help her better treat a client of hers who was a Methodist minister suffering from trauma brought on by the division of the church over the LGBTQ+ community, a highly politicized issue. In response, Gowan spent a significant portion of this meeting educating the team on the workings of the Methodist church.

36.    During a Tuesday meeting in the winter of 2021, after the State of Texas suffered a major power outage, the group engaged in a discussion about Senator Ted Cruz's decision to

leave for Mexico during the crisis. Hijazi participated in this discussion without hesitation and readily shared her negative views on Senator Cruz's actions and his politics with the team.

37.     On several different occasions, especially shortly after the Supreme Court of the United States overturned *Roe v. Wade* in June 2022, D2 therapists discussed the topic of abortion and access to health care—another hot-button political issue—during Tuesday meetings as well.

38.     During a Tuesday meeting in 2023, a D2 therapist sought consultation from the team to help her better understand and treat a client of hers who was a dominatrix engaged in a BDSM lifestyle. In response, the team spent part of this meeting discussing the client's issues, as well as the stigma and unique struggles faced by those engaged in BDSM-related activities.

39.     During another Tuesday meeting in 2023 that took place shortly after a mass shooting at the Allen Outlet Mall in Allen, Texas, the team had a group discussion about gun control.

40.     In 2024, during a Tuesday meeting that was held shortly after Donald Trump was elected for the second time as the President of the United States, Hijazi led the group in a discussion about how to approach clients who might have strong reactions to the outcome of the election. Hijazi then proceeded to complain to the group about President Trump as a politician, as well as to disparage his morals and ethics.

### E. Jewish Voices and Identities Are Shunned During the November 19, 2024, Tuesday Meeting.

41.     At all relevant times, Junger and Katz's Jewish identities were known to the D2 Defendants and their colleagues at D2. Both of Junger's parents are the children of Holocaust survivors. Junger lived in Israel for several years after high school, she has family members who still live in Israel, and her husband was born in Israel and served in the Israel Defense Forces. Katz's Jewish identity is similarly important to her and her family. She is raising her children in

accordance with Jewish traditions and customs, and she has traveled to Israel with her sons to reinforce their Jewish heritage.

42.     On Tuesday, November 19, 2024 (the "November Meeting"), D2 held its weekly team meeting as usual. The November Meeting was attended by nearly all D2 therapists, except for Gowan, who was vacationing at the time in Canada, and one other therapist unrelated to the present action.

43.     During the November Meeting, a non-Jewish D2 therapist, Kari Knott ("Knott"), sought the assistance of Junger and Katz, due to their lived experience and unique perspective as Jews, to help her better understand how to serve the psychological needs of a Jewish client who Knott explained was "experiencing trauma with everything going on" at that moment. Junger and Katz understood that Knott specifically sought their insight to better understand the Jewish perspective and experience and to allow her to obtain the cultural understanding necessary to effectively treat her Jewish client.

44.     Instead of recognizing that Junger and Katz might have useful insights to share with Knott to help her understand the deeply ingrained generational and collective trauma of the Jewish people that had been activated by recent events and the worldwide rise in antisemitism, Hijazi dismissed the idea entirely and prevented Junger and Katz from providing advice to Knott during the meeting. Specifically, before Junger and Katz even had a chance to respond to Knott's inquiry, Hijazi interjected and told Knott that seeking the help of Junger and Katz to better serve her Jewish client was not "a good idea," because she would "get a one-sided response." Hijazi—rather than allowing the conversation to continue, as she had done countless times before, even regarding politically charged issues—abruptly left the room, prematurely concluding the meeting.

45.     In doing so, not only did Hijazi violate applicable professional ethics rules by treating a client of D2 differently due to their Jewish identity and preventing a subordinate therapist from obtaining the cultural competence necessary to treat them, but she also made clear that her reason for silencing Junger and Katz and dismissing the insights they offered their colleague was, in fact, simply because they were Jews—which to Hijazi evidently meant that their insights on Jewish trauma, despite such insights being exactly what Knott had sought out, would necessarily be unhelpful and "one-sided."[23]

46.     Notably, Hijazi's silencing of Junger and Katz was also a departure from the regular practice during team meetings when sharing insights and openly discussing unique perspectives relating to non-Jewish clients of different backgrounds.

### F.  Plaintiffs Are Terminated for Objecting to Hijazi's Discriminatory Treatment of D2's Jewish Clients and Staff.

47.     Hijazi doubled down on her antisemitic sentiments and disparate treatment toward Junger and Katz the next day, Wednesday, November 20, 2024, when she sent an email to the entire D2 team issuing a blanket prohibition against "bringing up the Palestine Israel topic" in the workplace—notwithstanding the fact that this topic was not even raised during the meeting the previous day, except to the extent that Hijazi presumed its relevance within the context of a non-Jewish therapist seeking a greater understanding of Jewish trauma. Hijazi's request was purportedly prompted by the fact that she personally has "great pain around" the Israel-Palestine topic.

---

[23] *See* "Texas Psychological Association: Mission and History," Texaspsyc.org, https://www .texaspsyc.org/mission-and-history (accessed May 13, 2025) (explaining that the mission of the Texas Psychological Association is "to support psychologists' professional interests, promote and protect the science and practice of psychology, and advocate for the health and well-being of all people, including individuals from diverse and marginalized backgrounds.").

**Plaintiffs' First Amended Complaint - Page 15**

48.     At 10:56 a.m. that same Wednesday, Junger responded to Hijazi's earlier email banning "bringing up the Palestine Israel topic" in the workplace, about an hour after she received it. In her response, Junger voiced her objections to Hijazi's handling of the situation and emphasized that the "Israel/Palestine topic" was not actually raised during the meeting the previous day, but instead that "Kari [Knott] was looking to be more culturally competent to her Jewish client that is experiencing current trauma." She further explained that by doing so, Knott was "doing her due diligence to understand what her client is experiencing and asking her colleagues who have first-hand knowledge to help her out." Junger also pointed out the disparate treatment and double standard exhibited by Hijazi in her response as well: "How can we service our clients if we are not allowed to talk about their experiences? One of the basic tenets of our profession is to be culturally competent. If this was about understanding and gaining insight into any other single demographic, I do not believe that anyone would shut it down, regardless of their own triggers."

49.     A screenshot of the complete 10:56 a.m. email sent by Junger to the D2 team in response to Hijazi's initial email is below:

**Plaintiffs' First Amended Complaint - Page 16**

---

**Jackie Junger** <jackie@d2counseling.com>
To: Dina Hijazi <dina@d2counseling.com>
Cc: Team <team@d2counseling.com>

Wed, Nov 20, 2024 at 10:56 A

I definitely agree that we should all be cognizant of others' pain and what different topics might bring up for all of us. As far as I'm aware, the Israel/Palestine topic has not been brought up in the 12PM Tuesday meetings since last Oct 7 2023. Dina, your pain is incredibly valid and I know you have family and friends that are directly impacted by the awful situation. I am truly sorry for all the pain you and your loved ones are experiencing.

My pushback to your email is that Kari never mentioned Israel, Palestine, or the conflict. Kari was looking to be more culturally competent to her Jewish client that is experiencing current trauma. Kari was doing her due diligence to understand what her client is experiencing and asking her colleagues who have first hand knowledge to help her out. I believe every single one of us has Jewish clients, and the more we understand, the better we can service our clients.

After you left the room, I had asked the other colleagues if they were aware of any of the recent antisemitic attacks that have been happening globally and locally (not even in the Middle East), and each one said no they were not. How can we service our clients if we are not allowed to talk about their experiences? One of the basic tenets of our profession is to be culturally competent.

If this was about understanding and gaining insight into any other single demographic, I do not believe that anyone would shut it down, regardless of their own triggers. This was not an Israel/Palestine debate, this was "help me understand your trauma".

I humbly decline your request and actually would love to have a space where everyone is allowed to ask questions pertaining to bettering their understanding of their clients.

If anyone has any questions, even the difficult ones, I am so happy to have a conversation with you.

[Quoted text hidden]

---

50.     Less than an hour after receiving Junger's November 20 email above objecting to Defendants' discriminatory behavior, Defendants began discussing whether Junger should be removed from the practice. At 11:30 a.m. that same day, Hijazi texted Gowan that she was "fed up" with Junger's[24] "attitude" and questioned whether Junger could remain "part of this team." A screenshot of the complete text message at issue sent from Hijazi to Gowan at 11:30 a.m. on November 20 is below:

---

Nov 20, 2024 at 11:38 AM

Since you're reading emails -
I'm on the ledge and fed up with Jackie's attitude. I'm not sure if I can have her part of this team.

---

[24] References in Defendants' communications to "Jackie" refer to Plaintiff, Yocheved Junger.

**Plaintiffs' First Amended Complaint - Page 17**

51.    Junger attempted to tell Hijazi directly that Hijazi's discriminatory behavior was not "professional and ethical," as Hijazi acknowledges in other contemporaneous text messages sent by Hijazi to Gowan later in the day. Hijazi nonetheless immediately attributed Junger's objections to her Jewish identity rather than the substance of Junger's concerns. Indeed, Hijazi stated in texts to Gowan that the discussion of Jewish trauma during the November 19 meeting reflected the "entrenched views of all three of our Jewish therapists"—not just Plaintiffs—and concluded that there was "no conversation or discussion to be had" on the topic.

52.    By treating Jewish identity as a proxy for bias and inflexibility—and using that characterization to justify silencing Plaintiffs and foreclosing any dialogue—Hijazi excluded Plaintiffs from participation on the basis of protected status, not conduct. This framing reflects discriminatory animus toward Jewish identity and establishes a causal connection between Plaintiffs' Jewish identity and the adverse actions taken against them.

53.    Later that evening, Katz reacted to Hijazi's initial email by expressing similar objections to those articulated by Junger. Specifically, Katz responded via email to the D2 team and stated, among other things, the following: "I am confused as I do not recall Kari [Knott] referencing Palestine, Palestinians, or Israel when she asked for resources from us to help her understand and support her Jewish client who is experiencing trauma. . . . I understand that you were protecting yourself by leaving the room however the impact was that some of us felt shut down and unheard. Denial of the reality of any members of the team is not appropriate and, in this case, furthers the marginalization that many Jews have felt the entirety of their lives and carry[] [in] their bones through generations of denial and blame."

54.    A screenshot of the 5:44 p.m. email sent by Katz to the D2 team in response to Hijazi's initial email is below:

Good morning Dina,

I am confused as I do not recall Kari referencing Palestine, Palestinians, or Israel when she asked for resources from us to help her understand and support her Jewish client who is experiencing trauma.

I do recall although you were not part of that ask, you volunteered that it would not be helpful for Kari to get information from any of us because it would be one-sided. Cultural competency related to our clients trauma is a must to be an effective therapist.

Furthermore as a managing partner in this practice I think it was essential for you to be able to manage the inquiry without adopting the victim role and personalizing it to your pain. You are not the only one who walked out of that room feeling pain and grappling with self-.

I understand that you were protecting yourself by leaving the room however the impact was that some of us felt shut down and unheard. Denial of the reality of any members of the team is not appropriate and, in this case, furthers the marginalization that many Jews have felt the entirety of their lives and carrying their bones through generations of denial and blame.

If I have to limit the subjects that I talk about or limit discussing traumas that our clients experience then I wish to no longer participate.

Kind Regards,
Jacqueline

55.     Within hours of receiving Katz' email, Gowan sent a text message to Hijazi dismissing Plaintiffs' objections to antisemitism by characterizing their concerns as an identity-based fixation rather than as legitimate professional or ethical issues. Referring to the discussion of antisemitism and Jewish trauma, Gowan stated that "the topic gets to be where the zealots come out," describing it as "their lifelong passion," "part of the victim story," and a way for "them" to feel "self-righteous." He further reduced Plaintiffs' advocacy to "little children clamoring for attention." A screenshot of the complete text message sent from Gowan to Hijazi at 7:45 p.m. on November 20 is below:

I think I know what has happened. At least this is my first shot at it. I think Jackie is as we see and always has been she pushes against you and is pretty naïve about life. I think the only other thing is Jacqueline saw an opportunity for an audience and I don't think it's anything more than that. The topic gets to be where the zealots come out -this is their lifelong passion and defensiveness and part of the victim story and they get to feel self-righteous about it.  My first thought is we put out an email in the morning that says here's what we're doing and the principles we follow in our PC. I do think -if possible -to catch Jacqueline tomorrow and just say what's going on. I don't think there's anyway she says that stuff if she didn't have an audience of the public TEAM email to do that with.  She and Jackie and possibly at least get to jump on. This is their topic of identity and feel self-righteous about it, Jacqueline did the same thing about how she can never be held hostage about talking about peoples trauma with the same level of indignation.
If you'd like me to do that and call her from here I can. And then we just send an email to Jackie and say we're gonna get together with her when we could get the three of us together, about what's going on in the email.
I think we move forward, state our principles for the business meeting, and move on. Little children clamoring for attention

56.    In context, Gowan's statements to Hijazi set forth above were not neutral descriptions of a workplace disagreement. The subject of the exchange was antisemitism and the treatment of Jewish clients. By portraying Jewish concerns about antisemitism as exaggerated, manipulative, and attention-seeking, Gowan invoked and relied upon well-recognized antisemitic stereotypes to delegitimize Plaintiffs' objections. This framing reflects discriminatory animus toward Jewish identity.

57.    The next morning, instead of investigating Junger and Katz's objections to discrimination, Hijazi messaged Gowan making clear that she intended to treat Plaintiffs' protected communications objecting to discrimination as personal attacks. To be sure, Hijazi repeatedly described the Plaintiffs' protected activity emails as them "attacking" her. She also made clear that she desired to terminate Plaintiffs in retaliation for their purported "attacks."

58.    Shortly thereafter, at 8:38 a.m. on November 21, Hijazi sent a text message to Gowan to strategize regarding what she should say in response to Katz' email the day prior. Tellingly, Hijazi suggests responding to Katz by telling her that she's "delusional" and is "really changing [her] views of Jewish people to aggressive." A screenshot of the complete text message sent by Hijazi to Gowan at 8:38 a.m. on November 21 is below:

> Do you want me to draft an email and send it to you? Also, I'm gonna go into work just to show my presents. I will see Jacqueline. What comes to mind is saying managing partner? You're delusional or wow, you are really changing my views of Jewish people to aggressive? Or
> Your response is very unfortunate
> Thoughts?

59.    A couple hours later, at 10:34 a.m. on Thursday, November 21, Hijazi replied to the team email thread again and doubled down on her discriminatory actions. In this November 21, 2024, email, Hijazi clarified that she had discussed the issue with Gowan—who was still on vacation at the time—and that her message banning the sharing of "political or religious opinions" during team meetings was speaking on behalf of both her and Gowan as owners of D2.

**Plaintiffs' First Amended Complaint - Page 20**

60.    A screenshot of a complete copy of Hijazi's 10:34 a.m. email to the D2 team is

below:



61.    Shortly thereafter, Gowan sent a separate email to the D2 team confirming that the

Thursday, November 21, 10:34 a.m. email sent by Hijazi to the D2 team "went out from [their]

partnership," and that "[a]s the leaders of D2," Gowan and Hijazi were "both completely aligned

on this message."

62.    A few minutes later, at 11:20 a.m. on Thursday, November 21, Katz responded

again to the email chain with the D2 team, as follows: "I think your failure to see that this was not

a political conversation is a huge blind spot for you."

63.    Minutes after Katz sent her renewed objections via email to the team, she received

harsh admonishments from Hijazi and Gowan telling her that *she* was "way over the line."

64.     Screenshots of complete copies of these email admonishments from Hijazi and Gowan are below:



65.     When Katz attempted to communicate privately with Gowan later that day to convey the seriousness of her concerns and seek understanding, Gowan immediately forwarded Katz' email to Hijazi—the very individual whose directive Plaintiffs had challenged as discriminatory. This confirmed to Plaintiffs that no meaningful or neutral avenue existed to raise objections outside of the team email thread. Defendants' practice of immediately forwarding Plaintiffs' private communications to Hijazi—the alleged discriminator—rendered any alternative reporting channel futile.

66.     Over the next few days, Defendants conducted no investigation whatsoever. They did not interview Plaintiffs, seek clarification of their concerns, consult neutral witnesses, or evaluate applicable professional standards. Instead, termination discussions proceeded immediately without any good faith inquiry into the substance of Plaintiffs' objections.

**Plaintiffs' First Amended Complaint - Page 22**

67.     A few days later, Junger echoed Katz's sentiments in a heartfelt message to Gowan and Hijazi as well as the D2 team at 7:39 p.m. on Sunday, November 24, 2024. Junger intended to appeal to Gowan and Hijazi in good faith, in an effort to help them to see and understand the discriminatory nature of their handling of the situation.

68.     A screenshot of a complete copy of Junger's Sunday, November 24, 7:39 p.m. email to Gowan and Hijazi is below:

From: **Jackie Junger** <jackie@d2counseling.com>
Date: Sun, Nov 24, 2024 at 7:39 PM
Subject: Re: Tuesday 12-1 Meetings
To: Dina Hijazi <dina@d2counseling.com>
CC: Jacqueline Katz <jacqueline@d2counseling.com>, Daniel Gowan
<daniel@d2counseling.com>, Team <team@d2counseling.com>

In an effort to be respectful of D2's policies, I would love some clarification, as I am feeling lots
of confusion. Here are some of the stated reasons that you've provided thus far for shutting
down Kari's question about wanting resources and insight to better help her understand her
Jewish client's trauma.

- At the meeting on 11/19/24 you had stated the reason we couldn't discuss Kari's case
  was "I don't think it's a good idea because you'll get a one sided response". A one
  sided response to what exactly? The Jewish lived experience? That is precisely what
  she was wanting to know. I wouldn't ask a white woman to tell me about the lived
  experience of a Black male. It makes sense for the Jewish therapists to share what
  Jews are experiencing.
- Then in your email you shared "the noon team meeting is not a forum to present
  political or religious opinions". Yet, we spent the majority of the 11/12/24 meeting
  discussing Trump and the election with you asking all of us how we handled it with our
  clients, and encouraging the conversation. So clearly that can't be the reason. I also
  fail to understand how the Jews experiencing antisemitism is political?
- You further mentioned in an email that the reason this got shut down was "I have great
  pain around this". Which sounds personal, despite you later sharing in yet another
  email:
- "emotional safety for the group will always come before personal agendas at D2". Is
  your pain not a personal agenda?
- You shared it was not about cultural competency. How is it not?

The contradictory and inconsistent messaging leaves me feeling quite confused. Are we not
allowed to discuss Jewish clients due to a one sided response, it being political, your personal
pain, or emotional safety for the group?

Daniel and Dina, could you clarify how wanting to gain insight into our Jewish client's experience
violates any of those policies? I'm unclear what policy is even being referred to. Would wanting
more clarity on a Black client experiencing racism violate that policy as well? How about talking
about a client who is part of the LGBTQ community and experiencing trauma and
discrimination? Are we allowed to talk about their lived experience? Or does this rule only apply
to Jewish clients?

I would love a clear and comprehensive employee handbook on what we are and are not
allowed to talk about in regards to the weekly Tuesday meetings, lest we transgress D2's
values.

**Plaintiffs' First Amended Complaint - Page 24**

> To my fellow colleagues, I am so sorry but I will no longer be referring anyone Jewish to D2
> Counseling, since it is against policy to seek supervision, support, and understanding your
> Jewish client's lived experiences.
>
> In a twist of irony, while the conversation got censored, you are all first hand witnessing a
> smidge of what Jews are experiencing. The gaslighting, denial, blame and censorship of our
> experience.
>
> I know now that we are not allowed to discuss any of this in the Noon meetings, but I do not
> recall a ban about helping understand our clients via email? So to all my peers who care to
> understand what some of your Jewish clients are referring to when they say they are living in
> trauma, here is a recent list of *some* of the antisemitic attacks just in the past month:
>
> - A Rabbi was kidnapped and murdered over the weekend.
> - Jewish soccer fans were beaten, ran over, thrown into the river after a soccer game in
>   Amsterdam.
> - A Jewish man in Chicago was shot in a targeted attack. The assailant had a list of
>   Jewish synagogues on his phone to go shoot up, he was caught before he could.
> - A Jewish man in Tennessee was murdered
> - U.S. Antisemitic Incidents Skyrocketed 360% in the last year.
>
> I hope you all have a wonderful Thanksgiving!

69.     Katz responded to Junger's email in agreement soon afterward, stating, "I too have many of these same questions."

70.     On Monday, November 25, 2024—less than a week after raising their concerns with the D2 Defendants—Gowan terminated both Junger and Katz from D2 via voicemail. The only reason Gowan provided for their termination was that Gowan and Hijazi had apparently "come to the realization that this is not a good fit for [Junger and Katz] to continue working [] at D2."

71.     A screenshot of a copy of the transcript of the Google voice message left to Junger terminating her contract with D2 is below:

**Plaintiffs' First Amended Complaint - Page 25**



72.    Prior to the termination of their contracts on Monday, November 25, 2024, neither Junger nor Katz had any record of any performance issues or disciplinary history at D2, nor had Gowan and Hijazi raised any such issues with Junger and Katz.

73.    After the termination of their contracts, the D2 Defendants did not permit Junger or Katz to work through the remainder of their notice period in D2's offices. Instead, the D2 Defendants isolated Junger and Katz in a separate office space and forced them to see their clients there until the 30-day notice period concluded and their employment with D2 officially ended.

**Plaintiffs' First Amended Complaint - Page 26**

74.     Following the D2 Defendants' termination of Junger and Katz, both Junger and Katz received menacing letters from D2's legal counsel demanding that *they* pay tens of thousands of dollars to D2. In an attempt to further extort and punish Junger and Katz, these letters threatened to prosecute certain non-compete agreements in Junger and Katz now-terminated employment contracts.

75.     Chilled by the D2 Defendants' intimidation tactics and legal threats, Junger and Katz have been hindered in their ability to fully mitigate the wage damages they have incurred due to the D2 Defendants' unlawful conduct.

**G. Defendants' Shifting Explanations and Subsequent Admissions Provide Direct Evidence of Retaliation and Evidence of Pretext.**

76.     Even immediately after Plaintiffs' termination, Defendants continued to struggle to articulate a lawful reason for their actions. In a text exchange dated November 26, 2024, Defendants discussed how to retroactively "set[] the stage" for justification and acknowledged internally, "We have NOT said why we are terminating. Shit! I think we have to!" A screenshot of the complete text message exchange between Hijazi and Gowan on this topic from the afternoon of November 26 is below:

> Need a short call before I send emails to jj and jk.
> Do we need to link "temporary workspace" with "toxic/hostile environment" so we are setting that stage for what to come? I wait for your call.
>
> We have NOT said why we are terminating. Shit! I think we have to!

77.     Over the next few days, Defendants began actively shaping post-hoc explanations for the termination. In internal messages exchanged between Defendants on November 28, 2024, Hijazi objected to describing Plaintiffs' conduct as "attacking [her]" and instead proposed alternative "talking points," such as claiming Plaintiffs "refused to follow D2 policy" or "created a hostile work environment," adding, "I know we'll work out the details." In response, Gowan

**Plaintiffs' First Amended Complaint - Page 27**

stated, "Yes the story will refine." A screenshot of the complete text message exchange between

Hijazi and Gowan on this topic from November 28 is below:



78.    These discussions occurred after Plaintiffs had already been terminated and

demonstrate deliberate shifting of explanations to conceal retaliatory and discriminatory motives.

79.    On December 1, 2024, Hijazi expressly admitted in an email to Gowan that

Plaintiffs were terminated because of their protected activity emails. This admission provides

direct evidence of retaliation.

**H.    Plaintiffs File the Instant Case and Defendants Retaliate by Filing a Baseless State Court Action.**

80.    On June 18, 2025, Plaintiffs filed the Original Complaint [DE 1] in this action,

asserting claims under federal civil rights law based on Defendants' discriminatory and retaliatory

termination of Plaintiffs' contracts. Defendants were served and appeared in this action, receiving

notice of Plaintiffs' protected activity and intent to pursue statutory remedies.

81.    On November 25, 2025, during the discovery phase of this federal action, and while

Defendants were actively producing documents and defending against Plaintiffs' claims,

Defendants initiated a separate lawsuit against Plaintiffs in Dallas County District Court (the "State

Court Action"). A Copy of the Original Petition in the State Court Action is attached hereto as

**Exhibit A**. The State Court Action asserts claims for defamation and business disparagement

based on Plaintiffs' protected speech objecting to antisemitism, reporting discriminatory practices,

and advocating for culturally competent mental health care.

**Plaintiffs' First Amended Complaint - Page 28**

82.     The State Court Action targets speech on matters of public concern and lacks a reasonable factual or legal basis. Rather than rebut Plaintiffs' claims on the merits, Defendants elected instead to file tort claims attacking Plaintiffs' protected advocacy.

83.     Defendants' filing and prosecution of the State Court Action has imposed additional financial, emotional, and reputational harm on Plaintiffs and constitutes continuing post-employment retaliation.

## I.    Defendants' Conduct Demonstrates Reckless Disregard for Plaintiffs' Statutory Rights.

84.     Defendants acted with full knowledge that Plaintiffs were members of a protected class and that terminating them for raising concerns related to antisemitism posed a legal risk. Defendants acknowledged internally that the dispute involved the "Jewish therapists," sought legal advice, and recognized that their conduct could give rise to civil rights claims.

85.     Despite this awareness, Defendants chose to proceed with termination without investigation and to manufacture post-hoc justification rather than adopt a lawful, non-retaliatory course.

86.     Defendants' decision to file a state-court lawsuit against Plaintiffs during the pendency of this federal action further demonstrates reckless disregard. Rather than cease the challenged conduct or litigate Plaintiffs' civil rights claims in good faith, Defendants escalated their retaliation by asserting defamation and business disparagement claims based on Plaintiff's protected activity and speech. Defendants knew that Plaintiffs' statements concerned antisemitism, discrimination, and culturally competent care and understood that terminating Plaintiffs for raising those concerns posed legal risk. Despite that awareness, Defendants chose to weaponize civil litigation to punish Plaintiffs for asserting statutory rights and to deter continued pursuit of this

**Plaintiffs' First Amended Complaint - Page 29**

action, reflecting conscious wrongdoing and reckless disregard for Plaintiffs' federally protected rights.

## V.    CAUSES OF ACTION

### COUNT I
**Violation of 42 U.S.C. § 1981**
**(Interference with Right to Contract Based on Race)**

87.    Junger and Katz reallege and incorporate by reference all previous allegations set forth in the preceding paragraphs as if fully set forth herein.

88.    42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts."

89.    The right to "make and enforce contracts" is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

90.    As Jews, Junger and Katz are members of a racial minority that Section 1981 was designed to protect. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) ("Jews and Arabs were among the peoples then considered [when these civil rights statutes were passed] to be distinct races and hence within the protection of the [civil rights] statute[s].").

91.    The D2 Defendants intentionally discriminated against Junger and Katz because of their Jewish identities when they dismissed and silenced Junger and Katz's voices, subjected them to discriminatory workplace policies, and ultimately terminated their contracts and working relationships with D2.

92.    Junger and Katz's Jewish identities were a but-for cause of the discriminatory adverse actions they suffered at the hands of the D2 Defendants. Specifically, but for Junger and Katz's Jewish identities, they would not have had their voices dismissed as "one-sided" or unhelpful, would not have been the subject of discriminatory workplace policies further intended

**Plaintiffs' First Amended Complaint - Page 30**

to silence their ability to speak about their lived experience and understanding of Jewish trauma, would not have been put in the position to need to object to such discriminatory actions and policies directed toward them because they are Jewish, and would not have had their contracts with D2 terminated as a result of such objections.

93.      As a result of these actions, Junger and Katz suffered and continue to suffer actual damages, including monetary damages, damages to their reputations and careers, physical and emotional distress, mental anguish, humiliation, and other special damages, in an amount to be determined at trial.

94.      The D2 Defendants acted with malice and/or reckless disregard of Junger and Katz's rights and privileges as protected by law, and, as such, they should be subjected to punitive damages to deter unlawful conduct similar to the conduct alleged herein.

**COUNT II**
**Violation of 42 U.S.C. § 1981**
**(Retaliation)**

95.      Junger and Katz reallege and incorporate by reference all previous allegations set forth in the preceding paragraphs as if fully set forth herein.

96.      By reason of the foregoing, the D2 Defendants unlawfully retaliated against Junger and Katz for having exercised their right to oppose unlawful workplace discrimination as protected by 42 U.S.C. § 1981.

97.      Specifically, Junger and Katz engaged in a protected activity within the meaning of Section 1981 when they objected to the D2 Defendants' discriminatory treatment of a Jewish client and opposed—both verbally and in writing—the D2 Defendants' discriminatory efforts to dismiss and silence their voices because they are Jewish.

98.    Immediately after engaging in this protected activity, the D2 Defendants retaliated against Junger and Katz by terminating their contracts with D2.

99.    Junger and Katz's engagement in this protected activity was a but-for cause of the D2 Defendants' termination of Junger and Katz's contracts with D2.

100.    As a result of these actions, Junger and Katz suffered and continue to suffer actual damages, including monetary damages, damages to their reputations and careers, physical and emotional distress, mental anguish, humiliation, and other special damages, in an amount to be determined at trial.

101.    The D2 Defendants acted with malice and/or reckless disregard of Junger and Katz's rights and privileges as protected by law, and, as such, they should be subjected to punitive damages to deter unlawful conduct similar to the conduct alleged herein.

<u>**COUNT III**</u>
**Violation of 42 U.S.C. § 1981**
**(Retaliation)**

102.    Junger and Katz reallege and incorporate by reference all previous allegations set forth in the preceding paragraphs as if fully set forth herein.

103.    By reason of the foregoing, the D2 Defendants unlawfully retaliated against Junger and Katz for having exercised their right to oppose unlawful workplace discrimination as protected by 42 U.S.C. § 1981.

104.    Specifically, Junger and Katz engaged in a protected activity within the meaning of Section 1981 when they:

    a.    Objected internally to Defendants' discriminatory silencing of Jewish voices and refusal to permit culturally competent discussion regarding Jewish trauma and antisemitism;

    b.   Reported and opposed discriminatory workplace practices during their employment, and

    c.   Filed this federal civil-rights action vindicating their statutory rights and addressing matters of public concern, including antisemitism, workplace discrimination, and cultural competence in mental health care.

105.    Shortly after Plaintiffs engaged in this protected activity—and after Defendants were placed on notice of Plaintiffs' legal claims—Defendants retaliated by filing the State Court Action in Dallas County asserting claims for defamation and business disparagement, premised entirely on Plaintiffs' protected activity and speech.

106.    The retaliatory State Court Action expressly targets:

    a.   Statements Plaintiffs made while employed by Defendants in the course of raising concerns about antisemitism, cultural competence, and the treatment of Jewish clients, and

    b.   Statements Plaintiffs made in connection with this lawsuit and related advocacy—conduct squarely protected by federal civil rights law and the First Amendment.

107.    Plaintiffs' alleged statements—which Defendants rebrand as "defamation" and "business disparagement"—were made either:

    a.   In the context of Plaintiffs' opposition to workplace discrimination during their employment, or

    b.   In connection with Plaintiffs' petitioning activity and participation in this civil-rights action.

108.    Such speech constitutes protected activity as a matter of law. Defendants cannot recast civil rights opposition and litigation-related speech as tortious conduct in order to punish, intimidate, or deter employees from asserting federal protected rights.

109.    The timing of Defendants' state court lawsuit further establishes retaliatory motive. Defendants filed the State Court Action in close proximity to Plaintiffs' filing and prosecution of this federal lawsuit, creating a strong inference of causation.

110.    The baseless nature of Defendants' tort claims underscores their retaliatory intent. As pleaded:

    a.    The State Court Action relies on statements that are protected, substantially true, privileged, or non-actionable opinions;

    b.    The claims seek to impose liability precisely because Plaintiffs spoke out against antisemitism and discriminatory practices, and

    c.    The lawsuit functions as a punishment for Plaintiffs' civil rights advocacy rather than a legitimate attempt to remedy reputational harm.

111.    Retaliatory lawsuits of this nature are a well-recognized form of adverse action because they impose financial, emotional, and professional burdens designed to chill protected activity. *See e.g., Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 740, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (construing antiretaliation provision to "prohibi[t] a wide variety of employer conduct that is intended to restrain, or that has the likely effect of restraining, employees in the exercise of protected activities," including the retaliatory filing of a lawsuit against an employee).

112.    But for Plaintiffs' engagement in protected activity, Defendants would not have filed the State Court Action against them.

**Plaintiffs' First Amended Complaint - Page 34**

113.      As a result of these actions, Junger and Katz suffered and continue to suffer actual damages, including monetary damages, damages to their reputations and careers, chilling of their professional speech and advocacy, attorneys' fees and costs, physical and emotional distress, mental anguish, humiliation, and other special damages, in an amount to be determined at trial.

114.      The Defendants acted with malice and/or reckless disregard of Junger and Katz's rights and privileges as protected by law, and, as such, they should be subjected to punitive damages to deter unlawful conduct similar to the conduct alleged herein.

### VI.      PRAYER FOR RELIEF

115.      WHEREFORE, Plaintiffs Yocheved Junger and Jacqueline Katz respectfully request a jury trial, entry of judgment against the D2 Defendants, and an award with the following relief:

a.   An injunction enjoining the D2 Defendants, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in discrimination or retaliation against their Jewish clients or workers;

b.   A declaratory judgment that the D2 Defendants' actions violated Junger and Katz's rights under Section 1981;

c.   An order requiring the D2 Defendants to institute and carry out policies, practices, and programs that provide equal treatment for all workers and clients of D2, regardless of race or religion;

d.   Appropriate back pay with prejudgment interest in an amount to be determined at trial, and other affirmative relief necessary to eradicate the effects of the unlawful

acts complained of herein, including, but not limited to, reinstatement, or alternatively, an award of front pay;

e.  Compensation for past and future pecuniary losses and emotional damages resulting from the unlawful practices complained of herein in an amount to be determined at trial;

f.  Punitive damages in an amount to be determined at trial;

g.  Reasonable attorneys' fees and other litigation costs reasonably incurred by Plaintiffs in their defense of the retaliatory State Court Action;

h.  Reasonable attorneys' fees and other litigation costs reasonably incurred in this action as required by statute; and,

i.  An order granting Junger and Katz all further relief to which they may be justly entitled.

Dated: December 3, 2025

Respectfully submitted,

*/s/ Jaclyn S. Clark* _____
Jaclyn S. Clark (*admitted Pro Hac Vice*)
Florida Bar No. 117652
THE LAWFARE PROJECT
633 Third Avenue, 21st Floor
New York, NY 10017
(212) 339-6995
Jaclyn@thelawfareproject.org

LeElle B. Slifer
LSlifer@winston.com
Texas State Bar No. 24074549
Jervonne Newsome
JNewsome@winston.com
Texas State Bar No. 24094869
Brooke C. Wilson
Texas State Bar No. 24128027
William R. Morris III (*pro hac vice* forthcoming)
WMorris@winston.com
Texas State Bar No. 24124582
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, Texas 75201
Phone: (214) 453-6500
Fax: (214) 453-6400

*Attorneys for Yocheved Junger and Jacqueline Katz*

**Plaintiffs' First Amended Complaint - Page 37**