**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

|  |  |
|---|---|
| **YOCHEVED JUNGER and JACQUELINE KATZ,**<br><br>   *Plaintiffs*,<br><br>  v.<br><br>**DSQUARED RELATIONSHIPS PLLC,** *d.b.a. D2 Counseling*, **DINA HIJAZI, and DANIEL GOWAN,**<br><br>   *Defendants.* | **Civil Action No. 4:25-cv-650** |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Yocheved Junger ("Junger") and Jacqueline Katz ("Katz") (collectively, "Plaintiffs"), by and through their undersigned counsel, respond as follows to Defendants' Motion for Partial Summary Judgment with Incorporated Memorandum in Support (the "Motion") [DE 20]:

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

RESPONSE TO DEFENDANTS' STATEMENT OF ISSUE TO BE DECIDED........................ 2

STATEMENT OF FACTS ..................................................................................................... 2

    I.      Background, Professional Context, and Ethical Duties. .......................................... 3

    II.     A Pattern of Singling Out Jewish Clinicians and Jewish Trauma. ......................... 4

    III.    Defendants Silenced Plaintiffs' Professional Input on Jewish Trauma and
           Cultural Competence. .............................................................................................. 5

    IV.    Defendants Immediately Imposed a Speech Ban That Targeted Jewish Topics. ... 7

    V.     Plaintiffs Engaged in Protected Activity, Which Defendants Recognized as
           Such........................................................................................................................ 8

    VI.    Defendants' Contemporaneous Internal Communications Reveal Bias,
           Hostility, and Awareness of Legal Risk. .............................................................. 10

    VII.   Defendants Rushed to Terminate Plaintiffs Without an Investigation. ................. 13

    VIII.  Defendants' Consultation with Counsel Shows Consciousness of Wrongdoing.. 14

    IX.    Post-Termination Segregation and Threats Reinforce Retaliatory Intent............. 16

    X.     Defendants' Shifting Explanations Confirm Pretext and Knowledge of
           Wrongdoing. .......................................................................................................... 17

    XI.    This Integrated Record Squarely Supports Punitive Damages. ............................ 18

MEMORANDUM OF LAW ................................................................................................ 19

    I.      Legal Standard ...................................................................................................... 19

    II.     Defendants Acted in the Face of a Known Risk that Their Conduct Violated
           Federal Law. ......................................................................................................... 20

    III.    Defendants' "Good Faith" Reliance on Counsel Defense Fails as a Matter of
           Law. ...................................................................................................................... 21

    IV.    Defendants' Policy-Based "Good Faith" Defense is Inapplicable. ...................... 23

    V.     Punitive Damages Are Warranted by Defendants' Conduct Before and After
           the Termination...................................................................................................... 24

CONCLUSION................................................................................................................... 26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahmed v. Johnson*,
  752 F.3d 490 (1st Cir. 2014) ................................................................26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................................19

*Bruso v. United Airlines, Inc.*,
  239 F.3d 848 (7th Cir. 2001) ...............................................................20

*Burton v. Freescale Semiconductor, Inc.*,
  798 F.3d 222 (5th Cir. 2015) ...............................................................25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................................20

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*,
  188 F.3d 278 (5th Cir. 1999) ...............................................................24

*Deters v. Equifax Credit Info. Servs., Inc.*,
  202 F.3d 1262 (10th Cir. 2000) .......................................................23, 24

*Fuentes v. CAI Int'l, Inc.*,
  728 F. Supp. 2d 1347 (S.D. Fla. 2010) ..................................................21

*Kolstad v. American Dental Ass'n*,
  527 U.S. 526 (1999) .............................................................1, 20, 22, 23

*Lovejoy-Wilson v. Noco Motor Fuels, Inc.*,
  242 F. Supp. 2d 236 (W.D.N.Y. 2003) ..............................................21, 22

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
  212 F.3d 493 (9th Cir. 2000) ...............................................................23

*Rhines v. Salinas Const. Techs., Ltd.*,
  574 F. App'x 362 (5th Cir. 2014) .........................................................24

*Shaare Tefila Congregation v. Cobb*,
  481 U.S. 615 (1987) ........................................................................22, 24

*Stephens v. Brown & Root*,
  338 F. Supp. 680 (W.D. La. 1971), *aff'd*, 455 F.2d 1383 (5th Cir. 1972) ..............................21

*Yarbrough v. Tower Oldsmobile, Inc.*,
    789 F.2d 508 (7th Cir. 1986) ................................................................................24

**Statutes**

42 U.S.C. § 1981 ................................................................................2, 15, 22

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................19

Fed. R. Civ. P. 56(a) ................................................................................19

U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Compensatory
    and Punitive Damages Available Under Section 102 of the Civil Rights Act of
    1991* (July 14, 1992) ................................................................................24

## <u>INTRODUCTION</u>

Defendants' Motion rests on a fundamental mischaracterization of the punitive-damages standard. This is not a case involving a good-faith mistake about an unsettled area of law or an isolated personnel decision made without awareness of civil-rights implications. Rather, the record—viewed in the light most favorable to Plaintiffs—shows that Defendants recognized Plaintiffs were raising discrimination concerns, understood that Jewish employees constitute a protected class, anticipated legal exposure, and nevertheless chose to terminate Plaintiffs without investigation, while selectively disclosing facts to counsel and later refining post-hoc justifications for their actions.

Under *Kolstad v. American Dental Ass'n*, punitive damages are available where an employer acts "in the face of a perceived risk that its actions will violate federal law." 527 U.S. 526, 536 (1999). That standard focuses on the employer's state of mind—not on whether Defendants can now articulate non-discriminatory rationales or point to generalized policies. *Id.* at 537–38. Evidence of shifting explanations, failure to investigate protected complaints, anticipation of litigation, and selective reliance on counsel do not show the requisite state of mind to award summary judgment.

Defendants' authorities are inapposite. The cases they rely on involve employers who misunderstood the application of the law, lacked awareness of protected activity, or acted after neutral investigations. None involved termination decisions made by company owners immediately following protected objections to discrimination, accompanied by internal communications reflecting hostility, stereotyping, and legal-risk awareness. At minimum, the record presents disputed issues of fact regarding Defendants' intent and knowledge, precluding summary judgment on punitive damages. The Motion should be denied.

## **RESPONSE TO DEFENDANTS' STATEMENT OF ISSUE TO BE DECIDED**

Defendants frame the issue as whether the record "contains evidence" supporting punitive damages. This misstates the summary judgment standard. The proper question is whether genuine disputes of material fact exist regarding Defendants' knowledge and intent. They do. Viewing the evidence in the light most favorable to Plaintiffs, reasonable jurors could find that Defendants acted with malice or reckless indifference to Plaintiffs' federally protected rights. Because material disputes of fact exist regarding Defendants' state of mind, knowledge of legal risk, completeness of disclosure to counsel, and discriminatory/retaliatory intent, summary judgment is inappropriate.

## **STATEMENT OF FACTS[1]**

The record evidence establishes a clear pattern of discriminatory treatment, escalating retaliation, and conscious disregard of Plaintiffs' federally protected rights under 42 U.S.C. § 1981. Defendants' own words—emails, text messages, interrogatory answers, and contemporaneous internal communications—demonstrate that they understood the legal implications of their actions and proceeded anyway. From the earliest events through Plaintiffs' termination, Defendants repeatedly singled out Jewish clinicians for suppression, dismissed concerns about antisemitism, and responded to protected objections with hostility that intensified into termination and post-termination retaliation. Their conduct reflects not only discriminatory animus but reckless indifference to Plaintiffs' civil-rights protections, squarely supporting a punitive damages question to present to the jury.[2]

---

[1] Because Defendants provided their "Statement of Undisputed Material Facts" as an attachment to their Motion, *see* DE 20-1, Plaintiffs will provide their response in the same format. Accordingly, Plaintiffs' Response to Defendants' Statement of Undisputed Facts is attached as Exhibit 1.

[2] Rather than confining their factual presentation to evidence relevant to punitive damages, Defendants devote substantial space to criticizing Lawfare Project's litigation advocacy (protected

## I.    Background, Professional Context, and Ethical Duties.

Following the October 7, 2023 terrorist attacks in Israel, incidents of antisemitism dramatically increased worldwide, including in the United States. *See* DE 23 at ¶ 22-24. Mental health professionals recognized that Jewish clients were experiencing heightened anxiety, fear, isolation, and trauma associated with antisemitic hostility and historical persecution. *Id.* at ¶ 25-28. Professional ethical standards—including those promulgated by the American Psychological Association ("APA")—require mental health practitioners to provide culturally competent care, to avoid bias and stereotyping, and to ensure that clients from marginalized or targeted groups receive equitable and informed treatment. *Id.* at ¶ 19-21.

Defendant D2 Counseling ("D2") is a Dallas-based mental health practice owned and operated by Defendants Dina Hijazi and Daniel Gowan. *Id.* at ¶ 11-13. Plaintiffs Yocheved Junger and Jacqueline Katz are Jewish therapists who provided counseling services to D2 clients for years without any record of discipline, performance warnings, or client complaints. *Id.* at ¶ 7-10; 72. Plaintiffs' Jewish identities and backgrounds were well known at D2. *Id.* at ¶ 41.[3] Plaintiffs' cultural and religious backgrounds informed their clinical work and were part of the diversity of perspectives D2 represented to clients and staff.

---

speech), recounting Plaintiffs' past personal relationships, and highlighting Defendants' family and religious affiliations. Such material is irrelevant to the issues before the Court and amounts to inadmissible character and credibility evidence. That Defendants rely so heavily on these distractions—rather than evidence negating knowledge, intent, or perceived legal risk—highlights the weakness of their position at summary judgment.

[3] *See also,* D2's Responses to Plaintiffs' First (Amended) RFAs ("D2 Admissions"), at RFA No. 1, attached hereto as <u>Exhibit 2.</u>

D2 held recurring Tuesday team meetings intended for consultation, collaboration, and discussion of clinical issues affecting client care. *Id.* at ¶ 31.[4] These meetings regularly involved discussion of sensitive topics, including religion, politics, identity-based trauma, and culturally specific client issues. *Id.* at ¶ 33-40. Prior topics included religious practices across faiths, political developments, reproductive rights, mass-shooting responses, Texas infrastructure failures, and election-related stressors. *Id.* Defendants Hijazi and Gowan participated in and at times led these discussions. *Id.* Prior to November 2024, Defendants had no written policy prohibiting discussion of religion- or identity-related topics in team meetings, and no written or verbal prohibition had ever been disseminated to the team banning discussion of other emotionally charged subjects during meetings.[5]

## II.    A Pattern of Singling Out Jewish Clinicians and Jewish Trauma.

Before the events of November 2024, Defendants had already displayed a pattern of suppressing discussion related to Jewish trauma. During an October 10, 2023 Tuesday meeting— held just days after the October 7 Hamas massacre—therapists began organically discussing the emotional impact of the unfolding crisis.[6] Defendants abruptly shut the conversation down. In an

---

[4] See Junger's Responses to Defendants' First Set of Interrogatories ("Junger Interrogatory Responses"), attached hereto as <u>Exhibit 3</u>, at Response No. 6; Katz' Responses to Defendants' First Set of Interrogatories ("Katz Interrogatory Responses"), attached hereto as <u>Exhibit 4</u>, at Response No. 6.

[5] *See* Gowan's interlineated response to email from Todd Shadle asking how "parameters for topics of discussion" during meetings were communicated to employees (Defendants_000797-798), attached hereto as <u>Exhibit 5</u> (admitting that until Hijazi's November 20, 2024 email, such "parameters" were only communicated "verbally" and that "not everyone" on the team even knew about them).

[6] See Junger Interrogatory Responses at Response No. 13; Katz Interrogatory Responses, at Response No. 13.

email sent to all D2 therapists on October 16, 2023, Defendants expressly set forth that their reason for shutting down this conversation during the meeting was because "CC meetings are a time for us to gather as a team to discuss cases and professional issues" and not "personal/emotional issues that you are experiencing."[7]

But Defendants routinely permitted wide-ranging conversations on emotionally charged topics—including abortion, gun violence, BDSM, religion, and world events—without restriction. *See* DE 23 at ¶ 33-40. Discussions involving lived experience of Mormon, Muslim, Methodist, and other identities were openly encouraged. *Id.* Only discussions involving Jewish trauma or antisemitism were immediately halted. The October 10 episode signaled that Jewish concerns were uniquely unwelcome at D2.

This context framed the discriminatory escalation that followed in November 2024. A year later, when the same topic arose again in a plainly client-related context, Hijazi's response confirmed that her objection was not about meeting protocol—it was about discomfort with Jewish subject matter itself.

### III.    Defendants Silenced Plaintiffs' Professional Input on Jewish Trauma and Cultural Competence.

At the November 19, 2024 meeting,[8] non-Jewish therapist Kari Knott sought guidance on how to support a Jewish client "experiencing trauma with everything going on" at that moment.

---

[7] See October 16, 2023 email from Hijazi to the Team (Plaintiffs_000259), attached hereto as <u>Exhibit 6</u>.

[8] Defendants rely heavily on declarations from current D2 employees to characterize the November 19 meeting and Plaintiffs' conduct. Notably, every employee declaration submitted by Defendants contains the same glaring factual error: each states that the Tuesday team meeting giving rise to this action occurred on "November 17, 2024," a date that was not a Tuesday and on which no such meeting occurred. The undisputed date of the meeting was November 19, 2024. The repetition of this identical mistake across all declarations strongly suggests that the declarations were drafted centrally and signed without meaningful independent review of the underlying facts. At minimum,

*Id.* at ¶ 43. The reference was understood as relating to the ongoing surge in antisemitism and related distress experienced by Jewish individuals after October 7. *Id.* Plaintiffs—identifiable Jewish clinicians—were among the only team members with the relevant cultural and clinical expertise to answer. Knott's request sought input from Jewish colleagues with lived experience relevant to providing culturally competent care.[9] Yet before they could respond, Defendant Hijazi interrupted and stated that seeking their insight was "not a good idea" because Knott would receive a "one-sided response." *Id.* at ¶ 44. She then abruptly shut the discussion down and ended the meeting entirely. *Id.*

No geopolitical debate occurred during this exchange, and no participant raised foreign policy issues or political advocacy.[10] This request for guidance was within the ordinary and expected purpose of clinical meetings. Nonetheless, Defendants treated Plaintiffs' Jewish perspectives as inherently biased and inappropriate, attaching a negative stereotype to their cultural identity and rejecting their clinical expertise solely on that basis. As a result, Plaintiffs were humiliated, singled out, and stripped of professional authority because of their Jewish identity.

---

this uniform error undermines the reliability and probative value of the declarations and counsels against affording them weight at summary judgment, particularly where intent and credibility are disputed.

[9] *See* Text Messages exchanged between Knott and Junger on November 24, 2024 (the "Knott/Junger Text Messages"), attached hereto as <u>Exhibit 7</u> (Knott, expressing curiosity to Junger about how Hijazi "handles the stuff in Therapy" and suggesting "Perhaps she does not take any Jewish clients?")

[10] *See* Knott/Junger Text Messages (Knott conveying confusion about "all the topics we can and can't discuss in the meeting" and agreeing with Junger that her ask was not about "politics"); (Knott communicating her skepticism at Defendants' purported new policy against discussing emotional topics during team meetings, and opining that "I don't imagine there is a topic that any of us therapist can say we are uncomfortable with discussing in the group and that topic then becomes off-limits").

**IV.    Defendants Immediately Imposed a Speech Ban That Targeted Jewish Topics.**

The next morning, November 20, 2024, Hijazi sent a clinic-wide email banning discussion of the "Palestine Israel topic" during Tuesday team meetings because it caused her "great pain."[11] Notably, although Hijazi thanks Knott for her "apology for bringing up the Palestine Israel topic" in this email, the actual message from Knott, which Defendants attached as an exhibit to their Motion, shows otherwise. *See* DE 20-23 (Knott apologizing to Hijazi "for any disruption or hurt feelings that I may have elicited or caused" and reiterating that she was "just looking for resources and learning how I could better assist this client working through secondary trauma"). Although Hijazi framed her discussion ban as avoiding politics during team meetings, it functioned as a sweeping prohibition on discussing antisemitism, Jewish trauma, or Jewish identity in the workplace generally—especially given her refusal to distinguish between a culturally competent clinical inquiry and a geopolitical debate.[12]

On November 21, Hijazi and Gowan—"as the leaders of D2"—issued further directives prohibiting "political or religious opinions."[13] This sort of prohibition had never been applied to any other cultural, identity-based, or sensitive topics discussed freely in weekly meetings. Defendants enforced this "policy" only when Jewish clinicians attempted to discuss Jewish

---

[11]  *See* Hijazi's November 20, 2024 email to the Team re: A Request for Help (Defendants_000246), attached hereto as <u>Exhibit 8.</u>

[12]  *See* Junger Interrogatory Responses, at Response No. 15; Katz Interrogatory Responses, at Response No. 15.

[13]  *See* November 21, 2024 emails sent by Hijazi and Gowan to the Team (Defendants_000528-529), attached hereto as <u>Exhibits 9 and 10</u>.

issues.[14] The ad hoc, selective nature of these restrictions demonstrates Defendants' awareness that they were targeting Jewish-specific content and their conscious choice to silence only that content.

## V.    Plaintiffs Engaged in Protected Activity, Which Defendants Recognized as Such.

Plaintiffs immediately objected to what they perceived as discriminatory suppression. First, both Plaintiffs verbally objected during the November 19 meeting, when Hijazi prevented them from providing the insight sought by Knott as to how to treat her Jewish client with cultural competence.[15] Subsequently, in emails on November 20[16] and 24,[17] Plaintiff Junger wrote that:

- the November 19 incident concerned cultural competence, not Israel-Palestine politics;
- cultural competence was a "basic tenant" of the profession;
- Defendants had singled out Jewish trauma for silencing;
- the shutdown "would never have happened if the client belonged to another demographic group."

---

[14] Defendants may try to point to record evidence invoking a purported "safe space" or "trauma response" justification to characterize their conduct as neutral. Even accepting that explanation for purposes of summary judgment, it does not entitle defendants to judgment as a matter of law on punitive damages. A reasonable jury could conclude that the "trauma" rationale was selectively invoked to shut down discussion of Jewish trauma while permitting other identity-related discourse, rendering it pretextual. Alternatively, even if Hijazi genuinely experienced a trauma response tied to her own protected identity, that fact would have made it all the more apparent that the situation was ethnically and religiously charged and required careful, even-handed, and non-discriminatory handling. That inference is particularly strong as to Defendant Gowan, who does not claim a trauma response and is not Palestinian, such that the "safe space" rationale does not apply to him at all. In either case, Defendants' explanation raises classic jury questions regarding intent, credibility, pretext, and state of mind—precisely the issues that preclude summary judgment on punitive damages.

[15] Junger Interrogatory Responses at Response No. 19; Katz Interrogatory Responses at Response No. 19.

[16] Junger's November 20, 2024 protected activity email (Defendants_000524) is attached hereto, as Exhibit 11.

[17] Junger's November 24, 2024 protected activity email (Defendants_000544) is attached hereto, as Exhibit 12.

Katz later echoed these concerns, sending similar protected activity emails on November 20,[18] 21,[19] and 24,[20] explaining, among other things, that the directive denied the historical and generational trauma experienced by Jewish people and marginalized Jewish identity within the workplace. These objections expressly raised discrimination concerns[21] and constituted opposition to perceived discrimination. Plaintiffs' contemporaneous text messages to each other make clear that this opposition was made in good faith.[22] Defendants' responses made clear they understood Plaintiffs were raising civil-rights issues:[23] Defendants reprimanded Katz for being "way over the line,"[24] hostility increased, and Defendants began privately characterizing Plaintiffs' protected

---

[18] Katz' November 20, 2024 protected activity email (Defendants_000526) is attached hereto, as Exhibit 13.

[19] Katz' November 21, 2024 protected activity email (Defendants_000531) is attached hereto, as Exhibit 14.

[20] Katz' November 24, 2024 protected activity email (Defendants_000546) is attached hereto, as Exhibit 15.

[21] Defendants admit this. *See* D2 admissions, at RFA No. 8.

[22] *See* Text Messages exchanged between Junger and Katz, attached hereto as Exhibit 16 (Plaintiffs acknowledging that they both independently came to the conclusion that the directive posed a cultural competency issue and expressing their good faith belief that by sending their protected activity emails they were "stand[ing] up for what is right" and that doing so was "important for our children").

[23] *See* Hijazi's "Notes" document (and email it was attached to), dated November 23, 2024 (Defendants_001595-1601) ("Hijazi Notes Document"), attached hereto as Exhibit 17, at 1601 (acknowledging that Plaintiffs' protected activity emails accused Hijazi of "getting in the way of the team becoming culturally competent" and "targeting [the Plaintiffs'] culture").

[24] *See* Gowan's November 21, 2024 email to Katz (Defendants_000253), attached hereto as Exhibit 18; Hijazi's November 21, 2024 email to Katz (Defendants_000535), attached hereto as Exhibit 19.

objections as "attacks."[25] Defendants' rapid escalation from discomfort to discipline reflects that they recognized Plaintiffs were accusing them of discriminatory conduct—yet chose to respond with retaliation.[26]

Plaintiffs raised these concerns in the only feasible way available to them. There was no HR department, no discrimination complaint procedure, and no neutral supervisor. The only person above them in the Dallas office was Hijazi—the person engaging in the discriminatory conduct. Under these circumstances, raising their concerns in the same team thread where the conduct occurred was not only reasonable; it was the only realistic and safe option available. Plaintiffs' emails were measured, professional, and appropriately directed to the individuals involved. What's more, when Plaintiff Katz did try to contact Gowan individually about her concerns,[27] he immediately forwarded Katz's email to Hijazi,[28] making it clear that complaining privately to Gowan was not a feasible option.

## VI. Defendants' Contemporaneous Internal Communications Reveal Bias, Hostility, and Awareness of Legal Risk.

Discovery revealed Defendants' contemporaneous text messages, which show escalating hostility, discriminatory stereotypes, and clear recognition of imminent legal exposure. Minutes after Junger's first email, Hijazi texted Gowan expressing anger about Junger's "attitude" and

---

[25] *See* Hijazi's November 21, 2024 text message to Gowan (Defendants_000812), attached hereto as <u>Exhibit 20</u>; *see also*, Hijazi's November 22, 2024 email to Marcus Earle re: Eeeeek – help please (the "Marcus Earle Email") (Defendants_000563), attached hereto as <u>Exhibit 21.</u>

[26] *See* Hijazi Notes Document, attached as <u>Exhibit 17</u>.

[27] *See* Katz' November 21, 2024 email to Gowan individually (Defendants_000540), attached hereto as <u>Exhibit 22</u>.

[28] *See* Gowan's November 22, 2024 email to Katz ccing Hijazi (Defendants_000542), attached hereto as <u>Exhibit 23</u>.

questioning whether she belonged at D2.[29] She also expressed her opinion that the discussion of Jewish trauma and antisemitism during the team meeting the day prior reflected the "entrenched views of all three of our Jewish therapists," and concluded that there was "no conversation or discussion to be had" with them as a result.[30] This is direct evidence of discrimination. It makes clear that Hijazi shut down the discussion of Jewish trauma during the November 19 team meeting not because the discussion was "graphic" or "divisive" like she now claims, but because, in her view, recognition of antisemitism and Jewish trauma in the first place is inherently "one-sided" or biased.

Gowan echoed Hijazi's sentiments, referring to Plaintiffs' objections to discrimination and concerns about antisemitism as part of "the victim story," and likening them to "little children clamoring for attention."[31] Hijazi described Plaintiff Katz as "delusional" and wrote that the situation was "really changing my views of Jewish people to aggressive."[32] Hijazi also repeatedly describes Katz as a "vengeful" "hysteric."[33] These comments reinforce that Defendants viewed Jewish clinicians as inherently biased, unreasonable, or hysterical.

---

[29] *See* Hijazi's November 20, 2024 Text Message to Gown (Defendants_000806), attached hereto as Exhibit 24.

[30] *See* Hijazi's November 20, 2024 Text Messages to Gowan (Defendants_000810), attached hereto as Exhibit 25.

[31] *See* Gowan's November 20, 2024 text message to Hijazi (Defendants_000812), attached hereto as Exhibit 26.

[32] *See* Hijazi's November 21, 2024 text message to Gowan (Defendants_000814), attached hereto as Exhibit 27.

[33] *See* compilation of Hijazi's Relevant Texts to Gowan during the Relevant Period (Defendants_000817, 819, 822); attached hereto as Exhibit 28.

Critically, their private communications also show they anticipated lawsuits,[34] acknowledged that Jews are a protected class,[35] and worried about how their conduct would be perceived. They discussed needing to "set the stage" for termination,[36] and feared their messages might be subpoenaed.[37]

On November 23, 2024, Hijazi prepared a detailed notes document summarizing her calls with other therapists and outlining potential responses to Plaintiffs' objections.[38] Before emailing this document to Gowan, Hijazi texted him suggesting they use encryption, stating, "Maybe we email that doc using encryption?" and "It would be devastating to have that disseminated."[39] This demonstrates awareness of legal risk and a desire to conceal potentially damaging communications. In the notes themselves, Hijazi explicitly acknowledged the content of Plaintiffs' protected activity emails, admitting that Junger accused her of "being unprofessional and getting in the way of the team becoming culturally competent" and "targeting her culture," while Katz accused her of "targeting her culture." These admissions confirm that Defendants understood Plaintiffs were objecting to perceived discrimination against Jewish therapists and clients prior to termination.

---

[34] *See* Hijazi's November 26, 2024 text from Hijazi to Gowan (Defendants_000864), attached hereto as Exhibit 29.

[35] *See* text messages exchanged between Hijazi and Gowan on November 22, 2024 (Defendants_000837), attached hereto as Exhibit 30.

[36] *See* Hijazi's November 26, 2024 text message to Gowan (Defendants_000865), attached hereto as Exhibit 31.

[37] *See* Gowan's November 22, 2024 text message to Hijazi (Defendants_000838), attached hereto as Exhibit 32.

[38] *See* Hijazi Notes Document, attached as Exhibit 17.

[39] *See* Texts from Hijazi to Gowan (Defendants_000849), attached as Exhibit 33.

In an email message from Hijazi to D2's "Business Coach," Marcus Earle—sent just days before Plaintiffs' terminations—Hijazi described the current dispute with Plaintiffs as "two of the Jewish therapists attacking me (on the issue of the Middle East conflict)."[40] Hijazi also told Earle "[w]e have also reached out to our labor attorney because this is likely to get very ugly," thus expressly acknowledging the associated legal risks. Notably, she did not describe the issue in neutral terms. She explicitly identified Plaintiffs by their Jewish identity. Even more troubling, she then forwarded to Earle the emails in which Plaintiffs objected to the discriminatory conduct, presenting those protected objections as the "attack" that concerned her.[41]

## VII.    Defendants Rushed to Terminate Plaintiffs Without an Investigation.

Despite receiving protected complaints, Defendants conducted no investigation. They did not interview Plaintiffs. They did not interview other staff. They did not solicit additional context, review professional ethics guidance, or attempt mediation. Instead, the only person they "consulted" was the individual accused of discrimination—Hijazi herself.[42]

Within 24 hours of Plaintiffs' written objections, Defendants were already planning termination.[43] By November 25—six days after the November 19 meeting and one day after receiving the final objection—they left both Plaintiffs a voicemail announcing that they were no

---

[40] *See* Marcus Earle Email, attached as Exhibit 21.

[41] *See* forwarded protected activity emails to Marcus Earle (Defendants_00537, 582), attached hereto as Exhibit 34.

[42] *See* D2 Admissions, at RFA Nos. 10-11, attached hereto as Exhibit 1; Gowan's Resp. to Plaintiffs' First (Amended) RFAs ("Gowan Admissions"), Nos. 2-5, attached hereto as Exhibit 35.

[43] *See* D2's Responses to Plaintiffs' First Set of Interrogatories ("D2 Interrogatory Responses"), attached as Exhibit 36, at Response No. 2.

longer a "good fit." *See* DE 23, at ¶ 70-71. No specific reason was provided, and Defendants have repeatedly shifted their explanations since. The speed, lack of investigation, and unilateral acceptance of the accused supervisor's narrative demonstrate, at a minimum, reckless indifference, not good-faith mistake.

## VIII.   Defendants' Consultation with Counsel Shows Consciousness of Wrongdoing.

On November 22, 2024—after Plaintiffs had already engaged in protected written opposition and after discriminatory statements were made internally—Defendants contacted labor and employment attorney Todd Shadle.[44] Their own emails show they sought legal advice only after they had already decided to fire Plaintiffs, telling Shadle: "***We may need to let go of them***… we want to make sure we are protected from accusations…***they are likely to claim antisemitism***," and "I don't believe there is a way to move forward and have them at our practice." (emphasis added). [45]

Defendants' communications to Shadle omitted material facts, including the substance of Plaintiffs' protected-activity emails, the Jewish-client inquiry that triggered the dispute, and the absence of any pre-existing policy limiting meeting topics.[46] They never told Shadle the truth about why Plaintiffs emailed—that they were objecting to discriminatory conduct. Instead, Defendants framed the issue as insubordination and interpersonal conflict, characterizing Plaintiffs' objections

---

[44] *See* "Todd Shadle Documents," which comprise of what Defendants' assert is the full body of written communications exchanged between Shadle and Defendants regarding the decision to terminate Plaintiffs (Defendants_000788-805), attached hereto as Exhibit 37.

[45] *See* Exhibit 37 at Defendants_000804-805.

[46] *See generally* Exhibit 37.

as "emotional emails… questioning my leadership" and "disrespectful and attacking."[47] There is no indication that they told Shadle their directive disproportionately silenced Jewish employees, that their subsequent instruction prohibiting religious and political opinions plainly burdened a protected group, or that Plaintiffs explicitly believed the directive was discriminatory.

Shadle advised that employers could limit workplace speech only if restrictions were not directed at protected characteristics such as religion or ethnicity, and acknowledged Defendants could face discrimination claims regardless of how they proceeded.[48] Shadle also suggested risk-mitigation options, including severance and releases. Shadle focused on whether bosses can control "topics of discussion," stating "a private employer can limit speech in the workplace," and discussed severance releases: "paying some money as part of a severance… is the only way to prevent a lawsuit."[49] Nowhere in the emails or invoice does counsel analyze retaliation, protected activity, §1981, discrimination, or failure to investigate.[50]

Despite these cautions—and despite their internal recognition that Plaintiffs' objections related to antisemitism and protected-class status—Defendants proceeded toward termination. Shadle's own invoice reflects limited involvement (approximately 1.8 hours) before the terminations occurred, with work described as analyzing "employees/contractors not following policies about topics of discussion," and does not reflect review of Plaintiffs' emails or

---

[47] <u>Exhibit 37</u> at Defendants_000804-805.

[48] <u>Exhibit 37</u> at Defendants_000794.

[49] <u>Exhibit 37</u>

[50] <u>Exhibit 37</u> at Defendants_000793.

Defendants' internal text messages evidencing hostility.[51] Shadle's declaration states that "termination would not violate anti-discrimination law," but only based on the false, one-sided story provided, repeating talking points like "insubordination," "disrespect," and "nothing to do with them being Jewish."[52] Defendants withheld facts that would clearly change any legal opinion, such as "they told us this directive was discriminatory toward Jews," "they believe the rule targets them because they are Jewish," and "we are firing them hours after they objected to discriminatory conduct." They cannot claim "good faith" reliance on counsel under these circumstances.

Defendants sought legal cover while deliberately concealing the information that would have led any competent lawyer to warn them against termination. Their selective disclosure underscores not confusion, but knowledge of illegality and an attempt to shield themselves from accountability.

## IX. Post-Termination Segregation and Threats Reinforce Retaliatory Intent.

After firing Plaintiffs, Defendants required them to see their remaining clients in a physically segregated space—treatment imposed on no other therapist. *See* DE 23 at ¶ 73. This discriminatory separation is consistent with Defendants' earlier silencing and marginalization of Jewish clinicians. Defendants also sent letters to all of Plaintiffs' clients about the separation, not just the clients that overlapped with D2—despite acknowledging that they "haven't done that before" with any other separating therapist.[53] This disparate treatment further evidences hostility and retaliatory intent.

---

[51] Exhibit 37

[52] Exhibit 37 at Defendants_000788-790.

[53] *See* November 27, 2024 text messages between Hijazi and Gowan (Defendants_000876), attached as Exhibit 38.

On December 19, 2024, Defendants' counsel sent Plaintiffs a letter demanding large payments and threatening enforcement of a non-compete agreement.[54] These threats were retaliatory and designed to punish them further for their protected objections. The timing and tone of the letter reinforce that Defendants remained motivated by hostility, not compliance.

While this case was pending and based on the same protected speech and activity at issue here, Defendants filed a state-court lawsuit[55] asserting defamation-based claims arising from Plaintiffs' complaints about antisemitism and discrimination—claims Plaintiffs allege are retaliatory. *See* DE 23, at ¶ 102-114.

## X.    Defendants' Shifting Explanations Confirm Pretext and Knowledge of Wrongdoing.

Even immediately after Plaintiffs' termination, Defendants continued to struggle to articulate a lawful reason for their actions. In a text exchange dated November 26, 2024, Defendants discussed how to retroactively "set[] the stage" for justification and acknowledged internally, "We have NOT said why we are terminating. Shit! I think we have to!"[56] Over the next few days, Defendants began actively shaping post-hoc explanations for the termination. In internal messages exchanged between Defendants on November 28, 2024, Hijazi objected to describing Plaintiffs' conduct as "attacking [her]" and instead proposed alternative "talking points," such as claiming Plaintiffs "refused to follow D2 policy" or "created a hostile work environment," adding,

---

[54] See December 19, 2024 Non-Compete Enforcement Letters to Plaintiffs, attached as <u>Exhibits 39 and 40.</u>

[55] *See* Original Petition in State Court Lawsuit, attached as <u>Exhibit 41</u>.

[56] *See* Defendants_000865, attached as <u>Exhibit 31</u>.

"I know we'll work out the details." In response, Gowan stated, "Yes the story will refine."[57] These discussions occurred after Plaintiffs had already been terminated and demonstrate deliberate shifting of explanations to conceal retaliatory and discriminatory motives. Notably, Defendants' decision to terminate Plaintiffs was made before the later email they now claim "defamed" them and contained "slanderous" accusations, revealing falsification of justification after the fact.[58]

On December 1, 2024, Hijazi expressly admitted in an email to Gowan that Plaintiffs were terminated because of their protected activity emails: "We are terminating the others for sending out team emails instead of addressing us (plus the violation)."[59] This admission provides direct evidence of retaliation. In the same email, Hijazi discussed pressuring another Jewish therapist, Elyse, to leave or commit fully, noting Elyse's support for Junger's protected activity email ("very well written - I want answers too") as a sign of disloyalty that challenged her livelihood and reputation—further evidencing consciousness of legal risk. Courts consistently recognize shifting and contradictory explanations as evidence of pretext and retaliatory motive.

## XI.    This Integrated Record Squarely Supports Punitive Damages.

Throughout the relevant period, Defendants repeatedly acknowledged that Plaintiffs' objections related to Jewish identity and antisemitism, anticipated legal claims alleging discrimination, and nevertheless proceeded with termination. Their contemporaneous communications reflect awareness of protected-class status, litigation risk, and the potential

---

[57] *See* November 28, 2024 text messages exchanged between Hijazi and Gowan (Defendants_000883), attached as <u>Exhibit 42</u>.

[58] *See* D2 Interrogatory Responses, Exhibit 36, at Response No. 9.

[59] *See* December 1, 2024 email from Hijazi to Gowan re "A few items + more" (Defendants_3138), attached as <u>Exhibit 43.</u>

unlawfulness of targeting speech related to identity-based discrimination—followed by deliberate action without full investigation or remediation.

The combined evidence—Defendants' identity-based language, deliberate silencing of Jewish perspectives, immediate retaliation against protected complaints, discriminatory segregation, post-termination threats, shifting explanations, and selective manipulation of legal counsel—demonstrates a fact issue for the jury to decide whether there was malice or reckless indifference. Defendants acted "in the face of a perceived risk" that their conduct violated federal law. They knew:

- Jews are a protected class,

- Plaintiffs had raised discrimination concerns,

- their internal messages could be subpoenaed,

- and their conduct exposed them to liability.

They proceeded anyway. The facts, taken as a whole, present a textbook punitive-damages scenario which should be submitted to the jury.

## **MEMORANDUM OF LAW**

### I.    **Legal Standard**

Summary judgment is only appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A "material fact" is one that might affect the outcome of the suit under governing law. *Id.* The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and

identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## II.    Defendants Acted in the Face of a Known Risk that Their Conduct Violated Federal Law.

Under *Kolstad v. American Dental Association*, punitive damages are available where an employer "discriminate[s] in the face of a perceived risk that its actions will violate federal law." 527 U.S. 526, 536 (1999). The inquiry focuses on the employer's *state of mind*—whether decisionmakers understood the legal implications of their conduct and nevertheless proceeded— not on whether they later articulated benign explanations. *Id.* at 535–36.

The factual record summarized above squarely fits that standard. Defendants' own contemporaneous communications show they understood that Plaintiffs were objecting to discriminatory treatment of Jewish clinicians and Jewish clients, recognized that Jews are a protected class, anticipated discrimination claims, and expressed concern that they would be sued. Rather than investigate or remediate, Defendants escalated toward termination (and then eventually terminated), discussed how to "set the stage," worried about subpoenas, and took steps to conceal their internal communications. A reasonable jury could readily conclude that Defendants acted with reckless indifference to Plaintiffs' federally protected rights.

Courts repeatedly emphasize that where evidence permits competing inferences about an employer's knowledge of legal risk, punitive damages cannot be resolved on summary judgment. *See e.g., Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858-61 (7th Cir. 2001) (denying summary judgment for punitive damages where decision makers "were familiar with antidiscrimination principles of Title VII" and workplace discrimination policies but demoted him anyway)). For this reason alone, Defendants' Motion should be denied.

20

### III.    Defendants' "Good Faith" Reliance on Counsel Defense Fails as a Matter of Law.

Defendants' primary defense articulated in their Motion—that consultation with counsel bars punitive damages—collapses under settled precedent and the factual record.

First, advice of counsel protects an employer only where it is sought before the challenged action, based on full disclosure, and relied upon in good faith. As *Stephens v. Brown & Root* explains, "advice of counsel, even though erroneous, when accepted and acted on by the client in good faith, is a shield against charges of malice and bad faith." 338 F. Supp. 680, 683 (W.D. La. 1971), aff'd, 455 F.2d 1383 (5th Cir. 1972). But *Stephens* draws a bright and critical line: "If it be shown that defendant knowingly misrepresented the facts to his counsel, the defense does not avail." *Id.* at 682. Where, as here, "[d]isputed fact questions exist as to what advice was sought, what disclosures were made by defendants to their counsel, whether legal advice was reasonable, and whether the defendants strictly complied with the legal advice" summary judgment on punitive damages is not appropriate.  *Fuentes v. CAI Int'l, Inc.*, 728 F. Supp. 2d 1347, 1359 (S.D. Fla. 2010) (holding that "[t]he defendants are not entitled to summary judgment on their good faith defense based on advice of counsel" where such fact questions remained).

Courts have repeatedly recognized that where the timing, completeness, or purpose of legal consultation is disputed, "good faith" reliance on counsel cannot be resolved as a matter of law and must be assessed by the jury. Indeed, as *Lovejoy-Wilson v. Noco Motor Fuels, Inc.* makes clear, the mere fact that an employer sought legal advice does not preclude punitive damages where the evidence supports an inference that the employer knew its conduct risked violating federal law and proceeded anyway. 242 F. Supp. 2d 236, 245 (W.D.N.Y. 2003). There, notwithstanding the employer's asserted belief that its conduct was lawful, the court denied summary judgment on punitive damages because the record permitted a jury to find that the employer acted with reckless indifference after being placed on notice of protected rights. *Id.* at 245–46.

Here, the record shows that Defendants consulted counsel only after Defendants had already decided termination was inevitable, and while deliberately omitting material facts—most notably that Plaintiffs were objecting to discriminatory treatment of Jewish clinicians and Jewish clients within the emails that Defendants sought to terminate them for sending. A reasonable jury could easily find that Defendants sought legal advice not to determine whether termination was lawful, but to obtain post hoc "cover" for a decision already made. These facts defeat any claim of good faith reliance as a matter of law.

What's more, under *Kolstad*, "good faith" sufficient to preclude punitive damages is narrowly limited to situations in which an employer's mistake arises from *novel, unsettled, or poorly recognized* legal obligations—not from disagreement with, or disregard of, well-established law. The Supreme Court explained that punitive damages may be unavailable where an employer is "unaware of the relevant federal prohibition" or acts with a "distinct belief that its discrimination is lawful," such as where "the underlying theory of discrimination may be novel or otherwise poorly recognized." *Kolstad*, 527 U.S. at 536–37. By contrast, where, as here, the governing prohibition is clear,[60] an employer's consultation with counsel does not negate reckless indifference.

Finally, even Defendants' own counsel acknowledged legal risk and the possibility of discrimination claims here. Proceeding despite that warning further supports a finding of reckless indifference under *Kolstad*. At minimum, Defendants' state of mind and the sincerity of their

---

[60] The law has been settled that Jews are protected against discrimination and retaliation under Section 1981 for nearly forty (40) years. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987).

purported "good faith" are issues for the jury—not grounds for insulating Defendants from punitive damages at summary judgment.

## IV.     Defendants' Policy-Based "Good Faith" Defense is Inapplicable.

Defendants also gesture toward a generalized "good faith" defense based on purported workplace policies. That argument misunderstands both the law and the posture of this case.

The *Kolstad* "good faith efforts" doctrine addresses vicarious liability—that is, whether an employer should be punished for the discriminatory acts of lower-level employees acting contrary to established anti-discrimination policies. *See Kolstad*, 527 U.S. at 545–46. It does not apply where, as here, the alleged discrimination and retaliation were carried out by the owners and top decisionmakers themselves. *See e.g., Deters v. Equifax Credit Info. Servs., Inc*., 202 F.3d 1262, 1271 (10th Cir. 2000) (holding that employer's liability for punitive damages was "premised on direct liability, not derivative liability, according to the doctrine of respondeat superior," and that the employer therefore did not have a good-faith defense where the decisionmaker responsible for enforcing policy knowingly disregarded discrimination); *Passantino v. Johnson & Johnson Consumer Prods., Inc*., 212 F.3d 493, 515–16 (9th Cir. 2000) (explaining that *Kolstad*'s good-faith defense concerns whether an employer may avoid vicarious liability for acts of managerial employees, and recognizing that "an individual sufficiently senior in the corporation must be treated as the corporation's proxy for purposes of liability").

This case does not implicate *Kolstad*'s vicarious-liability safe harbor. Defendants Hijazi and Gowan are the owners and final decisionmakers of D2; they are not low-level managers whose actions might be insulated by corporate compliance efforts. Where the discriminatory decision is made by those who speak for the company itself, liability for punitive damages rests on direct, not vicarious, conduct, and generalized policies do not establish good faith as a matter of law. Here,

because Plaintiffs' claims rest on Defendants' own actions—not the unauthorized conduct of subordinates—no policy-based shield is available.[61]

## V.    Punitive Damages Are Warranted by Defendants' Conduct Before and After the Termination.

Even setting aside Defendants' failed defenses, the factual record independently supports punitive damages.

First, Defendants conducted no investigation whatsoever into Plaintiffs' discrimination complaints. They did not interview witnesses or seek neutral input. Courts routinely treat failure to investigate discrimination complaints as evidence of reckless indifference. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999) (affirming award of punitive damages in race discrimination case where plaintiff "presented substantial evidence that Wal-Mart failed to respond effectively to her complaints about [her supervisor's] racial animus"); *Rhines v. Salinas Const. Techs., Ltd.*, 574 F. App'x 362, 368–69 (5th Cir. 2014) (upholding award of punitive damages in race and national origin discrimination case where testimony at trial revealed that the defendant employer "did not investigate" the plaintiff's complaints); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 514 (7th Cir. 1986) (punitive damages warranted under § 1981 where plaintiff brought his complaints of discrimination to management, who failed to respond); *Deters*, 202 F.3d at 1269 ("recklessness and malice are to be inferred when a manager responsible for setting or enforcing policy in the area of discrimination does not respond to complaints"); U.S.

---

[61] Even assuming arguendo that Defendants could raise a "good faith efforts" defense here based on their own discriminatory and retaliatory actions (which as a matter of law, they cannot), such defense would nonetheless fail because the Defendants' policies are insufficient on their face. *See* DE 20-21, 20-22. The policy manuals do not contain any provisions regarding procedures for reporting complaints of discrimination unrelated to sexual harassment, nor do they contain any provisions forbidding retaliation against employees who report any such complaints. *Id.*

Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Compensatory and Punitive Damages Available Under Section 102 of the Civil Rights Act of 1991* (July 14, 1992) ("The employer's actions after it was informed of discrimination should be considered. An employer who has notice of discriminatory conduct and fails to take action could incur punitive damages).

Second, Defendants' shifting explanations for termination—developed only after Plaintiffs were fired—support an inference of consciousness of wrongdoing. Post-hoc rationalizations and evolving justifications are classic indicators that the employer understood the legal vulnerability of its actions. *See e.g., Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 238 (5th Cir. 2015) (finding that "as a matter of law, a purported reason for a decision that postdates the actual decision is necessarily illegitimate" and holding that a jury could find the defendant employer's "post-decision reasons" to be disingenuous and evidence of pretext, especially where the asserted reasons were "potentially manufactured" and articulated only after defendants identified a "legal risk"). Here, Defendants' evolving and contradictory explanations are not merely evidence of pretext; they also support an inference of consciousness of wrongdoing. A reasonable jury could conclude that Defendants' post-hoc efforts to refine their story reflect awareness that the true reason for termination—Plaintiffs' protected objections to discrimination—was unlawful. That inference bears directly on reckless indifference and reinforces that punitive damages cannot be resolved at summary judgment.

Third, Defendants' contemporaneous internal communications demonstrate animus toward Jewish clinicians and hostility toward Plaintiffs' protected objections. These communications serve as direct evidence of discriminatory and retaliatory intent, and may support an award of punitive damages, regardless of whether Defendants admit to consciously harboring such animus.

*See e.g., Ahmed v. Johnson*, 752 F.3d 490, 503 (1st Cir. 2014) (noting that intentional discrimination can stem from "stereotypes and other types of cognitive biases").

Finally, Defendants' conduct did not stop at termination. The filing of a retaliatory lawsuit based on the same protected activity further supports punitive damages. Even if Defendants now claim they were unaware that retaliation was unlawful at the time of termination, that claim cannot insulate post-termination conduct undertaken with actual knowledge of the law. Continuing retaliatory actions after legal exposure has crystallized is paradigmatic reckless indifference.

Courts consistently defer punitive-damages determinations to the jury where, as here, the record supports competing inferences about knowledge, motive, and disregard of protected rights.

## CONCLUSION

Defendants have not shown—nor could they—that no reasonable jury could find malice or reckless indifference on this record.[62] The failure of Defendants' good-faith defenses, and the evidence of animus, non-investigation, shifting explanations, and ongoing retaliation all compel denial of Defendants' Motion.

Dated: December 23, 2025.                    Respectfully submitted,

                                        By: */s/ Jaclyn S. Clark*
                                        Jaclyn S. Clark (*admitted Pro Hac Vice*
                                        Florida Bar No. 117652
                                        **THE LAWFARE PROJECT**
                                        633 Third Avenue, 21st Floor
                                        New York, NY 10017
                                        Phone: (212) 339-6995
                                        Jaclyn@lawfareproject.org

---

[62] Even apart from the existing record, summary judgment on punitive damages is premature. The inquiry turns on Defendants' intent, knowledge, and credibility—issues typically illuminated through deposition testimony. Key witnesses, including Defendants themselves, have not yet been examined regarding their decision-making, communications, and consultation with counsel. Where intent and state of mind are central, and discovery remains ongoing, courts routinely deny summary judgment to permit the jury to resolve disputed factual questions.

LeElle B. Slifer
LSlifer@winston.com
Texas State Bar No. 24074549
Jervonne Newsome
JNewsome@winston.com
Texas State Bar No. 24094869
Brooke C. Wilson
Texas State Bar No. 24128027
William R. Morris III (*pro hac vice*
forthcoming)
WMorris@winston.com
Texas State Bar No. 24124582
Emily L. Wilkinson
EWilkinson@winston.com
Texas State Bar No. 24125457
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Phone: (214) 453-6500
Fax: (214) 453-6400

*Attorneys for Plaintiffs Yocheved Junger
and Jacqueline Katz*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document

was served on counsel of record via the CM/ECF system of the United States District Court for

the Eastern District of Texas on December 23, 2025.

*/s/ Jaclyn S. Clark*
Jaclyn S. Clark